UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Abdiyyah Ben Alkebulanyahh | ) | |
| (*fka* Tyree Alphonso Roberts), | ) | C/A No. 6:13-cv-00918-TLW-KFM |
| | ) | |
| Petitioner, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | |
| | ) | |
| William R. Byars, Jr., *Commissioner, South* | ) | |
| *Carolina Department of Corrections*; Wayne | ) | |
| C. McCabe, *Warden of Lieber Correctional* | ) | |
| *Institution*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| | ) | |

Petitioner is an inmate at the Lieber Correctional Institution of the South Carolina Department of Corrections under a sentence of death for the murders of Dyke Coursen and Dana Tate. Petitioner has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civ. Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on Respondents' Motion for Summary Judgment. (Doc. # 45). Petitioner has responded to Respondents' motion, and Respondents have filed a reply. (Docs. # 64, 72). Having carefully considered the parties' submissions and the record in this case, the undersigned recommends that the court grant Respondents' motion for summary judgment.

## BACKGROUND

*Underlying Case Facts*[1]

In January 2002, Petitioner lived in a trailer owned by Brenda Smith on Riley Road in Beaufort County.  Also residing at the trailer were Smith's husband, Isaac, and Petitioner's wife, Nzuri.  At the time of the crime, Kimberly Blake, with whom Petitioner had an infant daughter, was also staying there.  On January 8, 2002, Blake asked her friend, Strawberry Washington, to call the police to come to the house to assist her in leaving because Petitioner had hit her.  Beaufort County Sheriff's Deputies Dyke Coursen and Dana Tate responded.  According to Blake, when police arrived, Petitioner hid in the bedroom closet with his rifle.  He gave Blake the okay to go out of the bedroom.  She left the bedroom, and Brenda Smith gave the officers permission to search the bedroom. Officers Coursen and Tate went into the bedroom.  Smith and Blake heard gunshots.  Blake ran outside and down the road.  She was joined shortly after by Petitioner, who came through the woods with a gun in his hands.  Petitioner stated, "I just killed those two white bitches and I'm going to say it was self-defense."  Blake left Petitioner and returned to the scene to talk to police.

When backup officers responded to the scene, they found Coursen and Tate dead; Coursen had suffered six gunshot wounds, and Tate had seven.  Petitioner was subsequently found hiding under a bridge with a shoulder and hip wound and was arrested.  At the time, he had a black fanny pack carrying ammunition for an M-14 assault rifle, a cell phone, and a knife.  Police subsequently found a rifle magazine and an SKS assault rifle in the area in which Petitioner had fled.  The bullets and casings recovered from the victims and the scene of the crime were conclusively matched to the assault rifle. (Doc. # 44-15 at 2).

---

[1]   The factual background of this case is taken from the facts recited by the South Carolina Supreme Court in its published opinion in Petitioner's direct appeal, *State v. Roberts*, 632 S.E.2d 871, 872-73 (S.C. 2006). (Doc. # 44-15).

2

*Trial*

Petitioner was indicted by the Beaufort County Grand Jury during the March 2002 term of the Beaufort County Court of General Sessions for two counts of murder (2002-GS-07-0369, 0370). (App. 4532-33; Doc. # 44-4). The State filed a Notice of Intent to Seek the Death Penalty on January 22, 2002, and also served its Notice of Evidence of Aggravation on March 19, 2002. (App. 4524-25).

Initially, Petitioner was represented by Gerald Kelly and Sean Thornton of the Beaufort County Public Defender's Office. Petitioner moved to represent himself during the proceedings. (*See* App. 3892-3968). His motion was granted, but Mr. Kelly and Mr. Thornton were to remain as standby counsel. (*Id.*). The State was represented by Solicitor Randolph Murdaugh and Assistant Solicitors Duffy Stone and Angela Tanner, all of the Solicitor's Office for the Fourteenth Judicial Circuit. (App. 1).

On October 6, 2003, *voir dire* in the case began before the Honorable Daniel F. Pieper, Circuit Court Judge. (App. 63-1196). On October 10, 2003, the jury was selected, and the guilt phase of the trial began. (App. 1316, 1320-39).

On October 20, 2003, the jury convicted Petitioner of two counts of murder. (App. 3472-73). Petitioner advised the court he did not intend to offer any mitigating evidence and expressed his desire to absent himself from the proceeding; he indicated he would probably be unruly if required to be present. (App. 3481-83). As neither party could point to specific case law governing the circumstances, the court determined the best course of action was to proceed with Petitioner present in the courtroom, with the condition that if he became disruptive, the trial judge would take such action as necessary. (App. 3487-3535). Petitioner indicated his desire that counsel not represent him in any way, but ultimately decided counsel could remain as standby counsel to object to the introduction of improper evidence. (App. 3519-20, 3541-42).

3

After the statutory twenty-four hour waiting period, the sentencing phase of the trial began on October 21, 2003. (App. 3538).  The sentencing phase proceeded with Petitioner seated at counsel table. (*Id.*).  However, after multiple outbursts, the jury was removed, and Petitioner was placed in a conference room at the back of the courtroom. (App. 3556-60).

Throughout sentencing, the court offered to allow Petitioner to come back into the courtroom if he could do so without being disruptive; however, Petitioner indicated he would rather remain in the back room. (App. 3765, 3795).  Petitioner ultimately returned to the courtroom to make a closing statement to the jury. (App. 3828-39).  Judge Pieper submitted the following aggravating factors to the jury:

> The murder of a federal, state, or local law enforcement officer, peace officer or former peace officer, corrections employee or former corrections employee, or fireman or former fireman during or because of the performance of his official duties.

> Two or more persons were murdered by the defendant by one act or pursuant to one scheme or course of conduct.

(App. 3847, 4529).   The following mitigating factors were submitted to the jury:   "Whether the existence of any non-statutory mitigating circumstance was supported by the evidence.  And whether for any reason you can think of or for no reason at all, including an act of mercy, the defendant should be sentenced to life imprisonment without parole." (App. 3851).

On October 22, 2003, the jury found the existence of the aggravating factors and recommended a sentence of death on the murder counts.  That same day, Judge Pieper sentenced Petitioner to death. (App. 3861-68, 3873, 4533).

*Direct Appeal*

A timely Notice of Appeal was filed with the South Carolina Supreme Court. (Doc. # 44-5). Petitioner was represented on direct appeal by Acting Chief Attorney Joseph L. Savitz, III, and Assistant Appellate Defender Robert M. Dudek, both of the South Carolina Office of Appellate Defense.[2] (*See* Doc. # 44-13). On March 7, 2006, Petitioner submitted a Final Brief of Appellant to the state supreme court in which he raised the following issue:

> The judge erred by refusing to allow appellant to waive his right to be present at the sentencing phase, instead confining him to a holding cell attached to the courtroom in which he was visible to the jury, particularly since appellant's absence during sentencing was his pro se trial strategy and the State advanced no countervailing reason for requiring him to be present.

(Doc. # 44-15 at 3). The State, represented by Assistant Attorney General S. Creighton Waters, filed a Final Brief of Respondent on February 17, 2006. (Doc. # 44-14). Oral argument was held before the South Carolina Supreme Court on May 24, 2006. The South Carolina Supreme Court issued an opinion, *State v. Roberts*, 632 S.E.2d 871 (S.C. 2006), on July 24, 2006, affirming the convictions and sentences. (Doc. # 44-15).

Subsequently, Petitioner, through counsel, filed a Petition for Rehearing. (Doc. # 44-16). In the petition, Petitioner argued the Supreme Court of South Carolina had misapprehended the nature of the constitutional rights involved and had employed an unconstitutional harmless error analysis to assess the impact of the underlying error at sentencing. By order filed August 11, 2006, the Supreme Court of South Carolina denied the Petition for Rehearing. (Doc. # 44-17). The Remittitur was issued on August 11, 2006. (Doc. # 44-18).

---

[2] After appellant's initial brief was filed in the direct appeal, Petitioner moved to proceed *pro se.* (Doc. # 44-6). Both the State and the Office of Appellate Defense opposed the motion. (Docs. # 44-7, 44-8). Petitioner filed a response to the return to the motion. (Doc. # 44-9). By order filed June 3, 2005, Petitioner's Motion to Proceed *Pro Se* was denied. (App. 4973-81; Doc. # 44-10, *State v. Roberts*, 614 S.E.2d 626 (S.C. 2005)). Petitioner filed a *pro se* Motion for Reconsideration, which was denied by letter order filed July 8, 2005. (Docs. # 44-11, 44-12).

On August 17, 2006, Petitioner filed a Motion for Stay of Execution in order for him to seek certiorari from the Supreme Court of the United States. (Doc. # 44-19).  The State served its return on August 23, 2006. (Doc. # 44-20).  The Supreme Court of South Carolina granted the motion on September 7, 2006. (Doc. # 44-21).

On November 9, 2006, Petitioner filed a Petition for Writ of Certiorari in the Supreme Court of the United States. (Doc. # 44-22).  In the petition, Petitioner argued that a capital defendant may waive his right to be present at the sentencing phase of his trial where his absence during sentencing is the product of his trial strategy and the prosecution advances no countervailing reason for requiring him to be present.  The State filed its Brief in Opposition on February 5, 2007. (Doc. # 44-23). On March 19, 2007, the Supreme Court of the United States denied the Petition for a Writ of Certiorari by letter order. (Doc. # 44-24).

### PCR Action

On March 12, 2007, Petitioner filed a *pro se* Application for Post-Conviction Relief ("PCR") (2007-CP-07-715). (App. 4535-44).  In the application, Petitioner asserted several claims. First, he contended the verdict was contrary to the law of reasonable doubt and was based upon a false prosecution. (App. 4537).  Second, he argued the evidence proved that he committed no unlawful act because Officer Tate killed Officer Coursen. (*Id*.).  Third, Petitioner alleged his Sixth Amendment rights were violated when his petition for speedy trial was denied and ignored and when bail was not granted. (App. 4541).  Within that claim, Petitioner also alleged he was denied a fair trial because the alleged victims were honored as South Carolina heroes and inducted into the South Carolina Law Enforcement Hall of Fame as well as being honored on nationwide television by then President George Bush, who inducted them into the National Memorial for Police Officers on May 15, 2003. (*Id*.).  Fourth, Petitioner argued that, in violation of the Eighth Amendment, he was sentenced to death when evidence showed

someone else killed the alleged victims. (*Id.*). Fifth, Petitioner asserted that his constitutional rights were "abridged and the privileges and immunities afforded all citizens, his life, his liberty without due process of law nor equal protection under the law." *(Id.)*. Sixth, he averred that appellate counsel was ineffective for not asserting that he was denied due process of law, he was denied a fair trial, he was denied equal protection of the law, a Fourth Amendment issue, and an after-discovered evidence claim. (App. 4542).

On March 30, 2007, counsel for Petitioner in the direct appeal filed a Petition for Stay of Execution so that Petitioner could seek his available remedies in PCR. (Doc. # 44-25). On April 9, 2007, the State served its Return to Petition for Stay of Execution. (Doc. # 44-26). On April 12, 2007, Petitioner served a reply to the State's return. (Doc. # 44-27). On May 4, 2007, the Supreme Court of South Carolina granted the stay and assigned the Honorable Roger M. Young, Circuit Court Judge, to the PCR action. (Doc. # 44-28).

On August 8, 2007, Carl B. Grant and Glenn Walters were appointed to represent Petitioner in the PCR action. (Doc. # 44-29). On October 9, 2007, the State served its Return, Motion to Dismiss, and/or Motion for Summary Judgment. (App. 4569-98; Doc. # 44-30).[3]

On February 8, 2008, Petitioner, through his PCR counsel, filed an Amended Application for Post-Conviction Relief. (App. 4562-68). In this amended application, Petitioner contended the trial judge failed to make the proper findings to determine if he knowingly and intelligently understood the implications of proceeding *pro se.* (App. 4564). Specifically, Petitioner asserted:

> Under the Sixth Amendment, an accused may waive the right to counsel and proceed *pro se. Faretta v. California*, 422 US 806, (1975); *State v. Reed*, 503 S.E. 2d 747 (1998). The trial judge has the responsibility to ensure that the accused [sic] is informed of the dangers and disadvantages of self representation and makes a knowing and intelligent waiver of the right to counsel. The ultimate test of whether a Defendant has made a

---

[3] As pages were missing from the copy of the return in the appendix, Respondents attached a full copy as Doc. # 44-30.

knowing and intelligent waiver of the right to counsel is the Defendant's understanding. *Graves v. State*, 422 S.E. 2d 125 (1992).

In the present case, the trial Court failed to impress upon the Applicant the dangers and disadvantages of self representation. In addition, the trial Court failed to determine if the Applicant knowingly and intelligently waived his right to counsel. Further, the trial Court failed to determine that the Applicant understood what it meant to represent himself.

The inquiry by the Court was insufficient to determine if the Applicant understood what it meant to represent himself and waive the representation of experienced counsel.

(App. 4564). On March 21, 2008, the State served its Amended Return, Motion to Dismiss, and/or Motion for Summary Judgment. (App. 4545-57; Doc. # 44-31).[4]

On October 12-13, 2008, an evidentiary hearing was held before Judge Young in the PCR action.[5] (App. 4599-4920). Petitioner was present and was represented by Mr. Grant and Mr. Walters. (*Id*.). The State was represented by Assistant Attorneys General S. Creighton Waters and Alphonso Simon, Jr. (*Id*.).

By order filed by the Supreme Court of South Carolina on December 17, 2008, the Honorable Carmen T. Mullen, Circuit Court Judge, was assigned jurisdiction over the PCR action, and the order assigning Judge Young was rescinded. (Doc. # 44-32). The parties provided Judge Mullen with proposed orders. (Docs. # 44-33, 44-34). On September 17, 2009, the PCR Court filed its Order of Dismissal with Prejudice. (App. 5176-5229).

---

[4]  As there were pages missing from the copy of the amended return in the appendix, the respondents attached a full copy of the amended return as Doc. # 44-31.

[5]  The depositions of Robert Dudek, Joseph L. Savitz, III, and Dr. Donna Schwartz-Watts were introduced into evidence at the hearing.

*PCR Appeal*

On November 2, 2009, Petitioner timely served and filed a Notice of Appeal. (Doc. # 44-35).   Petitioner was represented by John Blume[6] on appeal. (*See* Doc. # 44-36).   On July 21, 2010, Petitioner filed a Motion to Remand for Additional Post-Conviction Proceedings.[7] (App. 5230-60).   On August 2, 2010, the State filed its response (App. 5261-81), and on August 9, 2010, Petitioner filed a reply. (App. 5282-92).   On August 16, 2010, Petitioner filed a Motion for Recusal requesting that Chief Justice Toal recuse herself from considering the Motion to Remand. (App. 5299-5302).   On August 30, 2010, Chief Justice Toal issued an order denying the Motion for Recusal. (App. 5303-08).   On October 20, 2010, the Motion to Remand was denied. (App. 5297-98).

On February 18, 2011, Petitioner appealed the PCR Court's order denying remand with the filing of a Petition for Writ of Certiorari. (Doc. # 44-36).   Petitioner raised three grounds:  (1)  the trial court erred in denying his motion under *Batson v. Kentucky*, 106 U.S. 1712 (1986); (2)  the trial court abused its discretion and thereby denied Petitioner's constitutional rights to due process and a fundamentally fair trial by failing to *sua sponte* order a new competency hearing prior to sentencing and/or terminate Petitioner's *pro se* status, and Petitioner was in fact incompetent during his trial proceedings; and (3)   Petitioner was denied due process and equal protection of the law and is thus entitled to a new PCR proceeding where:  (a) Petitioner's PCR counsel were not qualified under S.C. Code Ann. § 17-27-160(B); (b)  PCR counsel were ineffective; and (c)  Judge Carmen Mullen signed the order denying PCR, which contained numerous credibility findings, even though Judge Mullen was not present during the PCR hearing and did not hear the testimony of any witness. (Doc. #44-36).  On June 6, 2011, the State served its Return to Petition for Writ of Certiorari. (Doc. # 44-37).

---

[6]  Mr. Blume also represents Petitioner in this case.
[7]  The motion asserted the same claims asserted here in the federal petition.

On February 22, 2013, the Supreme Court of South Carolina denied the Petition for Writ of Certiorari. (Doc. # 44-38).  The Remittitur was issued on March 28, 2013. (Doc. # 44-39).

**State Habeas Petition**

On February 18, 2011, Petitioner also filed a Petition for Writ of Habeas Corpus with the Supreme Court of South Carolina, raising five issues. (Doc. # 44-40).  First, Petitioner contended he was deprived of a fair and reliable determination of the appropriate sentence guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and South Carolina law at the penalty phase of his capital trial because (a)  the trial judge failed to inquire into Petitioner's competency; (b) Petitioner was incompetent in fact; (c)  the trial judge failed to secure a knowing and intelligent waiver of Petitioner's right to present mitigating evidence; and (d)  the trial judge failed to terminate Petitioner's *pro* se status.  Second, Petitioner argued his death sentence violates the Fifth, Eighth, and Fourteenth Amendments because he was visibly shackled without justification and without individualized determination by the trial judge.  Third, Petitioner alleged he was deprived of his Sixth and Fourteenth Amendment right to the effective assistance of counsel during the penalty phase of the proceedings.  Fourth, Petitioner averred the prosecution exercised its peremptory challenges in a racially discriminatory manner in violation of his rights guaranteed by the Sixth and Fourteenth Amendments. Fifth, Petitioner asserted he was deprived of his Sixth and Fourteenth Amendment right to a fair trial before twelve fair and impartial jurors as a result of multiple prejudicial extraneous influences. (*Id.*).

The State filed its Return to Petition for Writ of Habeas Corpus on March 21, 2011. (Doc. # 44-41).  Petitioner filed a reply on May 18, 2011. (Doc. # 44-42).  On February 22, 2013, the Supreme Court of South Carolina denied the petition. (Doc.# 44-43).

## **FEDERAL PETITION**

On February 13, 2014, Petitioner filed his federal habeas petition in the instant case.

(Doc. # 31).  He raises the following grounds for relief:

> **Ground One**:  Petitioner was deprived of a fair and reliable determination of the appropriate sentence at the penalty phase of his capital trial guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial judge failed to inquire into Petitioner's competency.

> **Ground Two**:  Petitioner was incompetent throughout the guilt-or-innocence phase of trial violating the Due Process Clause.

> **Ground Three**:  Petitioner's death sentence violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as a result of the trial judge's failure to secure a knowing, voluntary, and intelligent waiver of the right to present mitigating evidence.

> **Ground Four**:  The trial judge erred in failing to terminate Petitioner's *pro se* status.

> **Ground Five**:  Petitioner's death sentence violates the Fifth, Eighth, and Fourteenth Amendments because he was visibly shackled without justification and without an individualized determination by the trial judge.

> **Ground Six**:  Petitioner was deprived of his Sixth and Fourteenth Amendment rights to effective assistance of counsel when trial counsel failed to object to evidence of general prison conditions during the penalty phase.

> **Ground Seven**:  Petitioner was deprived of his Sixth and Fourteenth Amendment rights to effective assistance of counsel when trial counsel failed to object to the extensive amount of victim-impact evidence introduced at the penalty phase.

> **Ground Eight**:  Petitioner was deprived of his Sixth and Fourteenth Amendment rights to effective assistance of counsel when trial counsel failed to object to inflammatory and improper statements made during the prosecution's closing argument, rendering the sentencing phase fundamentally unfair.

**Ground Nine**: The prosecution exercised its peremptory challenges in a racially discriminatory manner in violation of Petitioner's rights guaranteed by the Sixth and Fourteenth Amendments.

**Ground Ten**: Petitioner was deprived of his Sixth and Fourteenth Amendment rights to a fair trial before twelve fair and impartial jurors as a result of multiple prejudicial extraneous influences.

(Doc. # 31 at 18-56).

## APPLICABLE LAW

### *Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* At the summary judgment stage, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e).

### *Habeas Corpus Standard of Review*

Because Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. §

2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  In accordance with the AEDPA, claims adjudicated on the merits in a state court proceeding cannot be a basis for federal habeas corpus relief unless the decision was "contrary to, or involved an unreasonable application of clearly established federal law as decided by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (2).  When reviewing a state court's application of federal law, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000); *see also Harrington v. Richter*, 562 U.S. 86, --, 131 S. Ct. 770, 785 (2011).  Moreover, state court factual determinations are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Under the AEDPA, a state court's decision "must be granted a deference and latitude that are not in operation" when the case is being considered on direct review. *Id*. at 785.  Moreover, review of a state court decision under the AEDPA standard does not require an opinion from the state court explaining its reasoning. *See id*. at 784 (finding that "[t]here is no text in [§ 2254] requiring a statement of reasons" by the state court).  If no explanation accompanies the state court's decision, a federal habeas petitioner must show that there was no reasonable basis for the state court to deny relief. *Id*.  Pursuant to § 2254(d), a federal habeas court must (1)  determine what arguments or theories supported or could have supported the state court's decision; and then (2)  ask whether it is possible that fair minded jurists could disagree that those

arguments or theories are inconsistent with the holding of a prior decision of the United States Supreme Court. *Id*. at 786. "If this standard is difficult to meet, that is because it was meant to be." *Id*. Section 2254(d) codifies the view that habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

***Exhaustion and Procedural Default***

Federal law establishes this court's jurisdiction over habeas corpus petitions. 28 U.S.C. § 2254. This statute permits relief when a person "is in custody in violation of the Constitution or laws or treaties of the United States" and requires that a petitioner present his claim to the state's highest court with authority to decide the issue before the federal court will consider the claim. *Id*. The separate but related theories of exhaustion and procedural bypass operate in a similar manner to require a habeas petitioner to first submit his claims for relief to the state courts. A habeas corpus petition filed in this court before a petitioner has appropriately exhausted available state court remedies or has otherwise bypassed seeking relief in the state courts will be dismissed absent unusual circumstances detailed below.

The statute requires that, before seeking habeas corpus relief, the petitioner first must exhaust his state court remedies. 28 U.S.C. § 2254(b)(1)(A). In South Carolina, a person in custody has two primary means of attacking the validity of his conviction: (1) through a direct appeal, or (2) by filing an application for PCR. State law requires that all grounds be stated in the direct appeal or PCR application. Rule 203, SCACR; S.C. Code Ann. § 17–27–10, *et seq.*; S.C. Code Ann. § 17–27–90; *Blakeley v. Rabon*, 221 S.E.2d 767, 770 (S.C. 1976). If the PCR court fails to address a claim as is required by S.C. Code Ann. § 17–27–80, counsel for the applicant must make a motion to alter or amend the judgment pursuant to Rule 59(e), SCRCP to preserve the issue for appellate review. *Marlar v. State*,

653 S.E.2d 266, 267 (S.C. 2007).[8]  The Supreme Court of South Carolina has held that the presentation of claims to the state court of appeals without more is sufficient to exhaust state remedies for federal habeas corpus review. *State v. McKennedy*, 559 S.E.2d 850, 853 (S.C. 2002); *see also In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, 471 S.E.2d 454 (S.C. 1990).   In *McKennedy*, the Supreme Court of South Carolina specifically held that *In re Exhaustion* had placed discretionary review by the Supreme Court of South Carolina "outside of South Carolina's ordinary appellate review procedure pursuant to *O'Sullivan [v. Boerckel*, 526 U.S. 838 (1999)]." 559 S.E.2d at 854.   Accordingly, a claim would not be procedurally barred from review in this court for failure to pursue review in the Supreme Court of South Carolina after an adverse decision in the South Carolina Court of Appeals, either after a direct appeal or after pursuing relief in a PCR petition.

Procedural bypass, sometimes referred to as procedural bar or procedural default, is the doctrine applied when a petitioner seeks habeas corpus relief on an issue after he failed to raise that issue at the appropriate time in state court and has no further means of bringing that issue before the state courts.   In such a situation, the person has bypassed his state remedies and, as such, is procedurally barred from raising the issue in his federal habeas petition.   Procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by the federal courts. *See Smith v. Murray*, 477 U.S. 527, 533 (1986).   Bypass can occur at any level of the state proceedings if the state has procedural rules that bar its courts from considering claims not raised in a timely fashion.

---

[8]   In *Bostick v. Stevenson*, 589 F.3d 160, 162–65 (4th Cir. 2009), the Fourth Circuit Court of Appeals found that, prior to the Supreme Court of South Carolina's November 5, 2007, decision in *Marlar*, South Carolina courts had not been uniformly and strictly enforcing the failure to file a motion pursuant to Rule 59(e), SCRCP, as a procedural bar.  Accordingly, for matters in which there was a PCR ruling prior to November 5, 2007, the court will not consider any failure to raise issues pursuant to Rule 59(e) to effect a procedural bar.

If a prisoner has failed to file a direct appeal or a PCR and the deadlines for filing have passed, he is barred from proceeding in state court. If the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar. As the Supreme Court has explained: "[State procedural rules promote] not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case." *Reed v. Ross*, 468 U.S. 1, 10–11 (1984).

**Cause and Actual Prejudice**

"[A] federal court ordinarily may not consider claims that a petitioner failed to raise at the time and in the manner required under state law unless 'the prisoner demonstrates cause for the default and prejudice from the asserted error.'" *Teleguz v. Pearson*, 689 F.3d 322, 327 (4th Cir. 2012) (quoting *House v. Bell*, 547 U.S. 518, 536 (2006)). To show cause, a petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," *Murray v. Carrier*, 477 U.S. 478, 488 (1986), or that "the factual or legal basis for the claim was not reasonably available to the claimant at the time of the state proceeding." *Roach v. Angelone*, 176 F.3d 210, 222 (4th Cir. 1999). To show actual prejudice, the petitioner must demonstrate more than plain error. *Engle v. Isaac*, 456 U.S. 107, 134–35 (1982). Alternatively, Petitioner may "prove that failure to consider the claims will result in a fundamental miscarriage of justice." *McCarver v. Lee*, 221 F.3d 583, 588 (4th Cir. 2000) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). A fundamental miscarriage of justice equates to the conviction of someone who is actually innocent. However, "actual innocence" requires "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

## DISCUSSION

### *Procedural Default*

Respondents assert that all of Petitioner's claims are procedurally defaulted and barred from federal habeas review.  As noted above, Petitioner raised substantively identical claims to those before the court in his PCR appeal and in his state habeas petition.  The Supreme Court of South Carolina denied both the PCR appeal and the habeas petition in summary orders.[9] (Docs. # 44-38, 44-43).  Petitioner asserts that, under *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770 (2011), and *Johnson v. Williams*, — U.S. —, 133 S. Ct. 1088 (2013), the Supreme Court of South Carolina's summary dismissals constitute decisions on the merits.

In *Harrington*, the Supreme Court found that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." 131 S. Ct. at 784-85.  In *Johnson*, the Court clarified that this presumption applies equally when a state court order addresses some, but not all, of a petitioner's claims. *See* 133 S. Ct. at 1094. *Johnson*, however, did not alter the Court's directive that the presumption arises only in the absence of state law procedural principles barring merits review.

Here, Petitioner did not raise Grounds One through Eight or Ground Ten in his original or amended PCR applications.[10]  In addition, Petitioner did not raise Grounds Five, Nine, or Ten – all freestanding claims – on direct appeal.  Thus, pursuant to South Carolina procedural principles, none of

---

[9]  The order denying Petitioner's PCR appeal states, in its entirety:  "Petitioner seeks a writ of certiorari from the denial of his application for post-conviction relief.  We deny the petition." (Doc. # 44-38).  The order denying Petitioner's state habeas petition states:  "Petitioner seeks a writ of habeas corpus.  We deny the petition." (Doc. # 44-43).

[10]  Petitioner did raise a version of Ground Nine in his PCR application.  However, the PCR court found that those *Batson* claims were not viable claims for relief in PCR and expressly dismissed them on procedural grounds. (App. 5216-17).

Petitioner's claims were properly before the state supreme court on a petition for writ of certiorari or petition for writ of habeas corpus. *See Hyman v. State*, 299 S.E.2d 330, 331 (S.C. 1983); *Drayton v. Evatt*, 430 S.E.2d 517, 519-20 (S.C. 1993); *Pruitt v. State*, 423 S.E.2d 127, 128 (S.C. 1992) (issue must be raised to and ruled on by the PCR judge in order to be preserved for review); *Key v. Currie*, 406 S.E.2d 356, 357 (1991) (the Supreme Court of South Carolina "will not entertain actions filed in its original jurisdiction where the matter can be entertained in the trial courts of this State"); *Cummings v. State*, 260 S.E.2d 187, 188 (S.C. 1979); *Simmons v. State*, 215 S.E.2d 883, 885 (S.C. 1975) (issues that could have been raised at trial or in direct appeal cannot be asserted in PCR application absent a claim of ineffective assistance of counsel); S.C. Code Ann. § 17-27-20(B) ("This remedy [PCR] is not a substitute for nor does it affect any remedy incident to the proceedings in the trial court, or of direct review of the sentence or conviction.").   Accordingly, the undersigned does not presume that the Supreme Court of South Carolina's summary dismissals of those petitions reached the claims' merits. Rather, all of Petitioner's claims are procedurally barred from federal habeas review absent a showing of cause and actual prejudice.[11] *See Wainwright v. Sykes*, 433 U.S. 72, 84-87 (1977); *Fowler v. Joyner*, 753 F.3d 446, 460-62 (4th Cir. 2014).

*Cause & Actual Prejudice*

Petitioner argues cause on two grounds:   inadequate assistance of PCR counsel and Petitioner's incompetency during the state PCR proceedings.

Ineffective Assistance of PCR Counsel

Petitioner asserts that under the Supreme Court's ruling in *Martinez v. Ryan*, — U.S. —, 132 S. Ct. 1309 (2012), he can establish cause for his procedural default by showing that his PCR counsel was ineffective under the standard announced in *Strickland v. Washington*, 466 U.S. 668 (1984).

---

[11]   Petitioner has not asserted actual innocence, so the court will not address that portion of the *Wainwright v. Sykes* analysis.

In *Martinez*, the Court found that a petitioner could show cause for his failure to comply with an adequate and independent state procedural rule where his post-conviction counsel did not provide adequate assistance. 132 S. Ct. at 1318. However, to overcome the default, the petitioner "must also demonstrate that the underlying [procedurally barred] claim is a substantial one, which is to say that the [petitioner] must demonstrate that the claim has some merit." *Id.*

As discussed more fully under the "Merits" heading in this Report and Recommendation, the undersigned finds that Petitioner's habeas grounds lack merit. Accordingly, Petitioner cannot satisfy the requirements for overcoming procedural default outlined in *Martinez.*

<u>Petitioner's Competency During PCR Proceedings</u>

Petitioner asserts that he was incompetent in fact throughout the state appellate and post-conviction proceedings and that his incompetence impaired his ability to consult with his counsel and raise all potentially meritorious claims, thus causing his procedural default.

The Fourth Circuit has recognized that "profound mental illness may constitute cause to excuse a procedural default in certain circumstances." *Farabee v. Johnson*, 129 F. App'x 799, 802 (4th Cir. 2005) (citing *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004); *Thomas v. Cunningham*, 313 F.2d 934, 937 (4th Cir. 1963)). To overcome the procedural hurdle, the petitioner must show that his mental illness actually caused the procedural defaults. *Id.* at 804. In evaluating similar claims, courts have found cause where a petitioner has shown "that his mental illness interfered with his ability to appreciate his litigation position or to make rational decisions concerning the litigation during the entirety of the relevant time periods, *see Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir. 1999), so that he was unable to consult with counsel, file pleadings, or otherwise comply with state procedural requirements, *see Malone v. Vasquez*, 138 F.3d 711, 719 (8th Cir. 1998)." *Id.* (some citations omitted).

Here, Petitioner asserts that he was incompetent-in-fact during the penalty phase of his trial, his incompetence persisted throughout his appellate and post-conviction proceedings, and his mental illness remains unabated, impairing his ability to rationally consult with counsel. Petitioner rests this assertion on the same evidence and arguments supporting Ground Two. As discussed more fully in analyzing Ground Two, the undersigned does not find that the record supports a finding that Petitioner was incompetent-in-fact during his trial. Petitioner has not offered any additional evidence or pointed to evidence in the record relating specifically to his competence during his appellate and post-conviction proceedings. In the absence of such evidence, the undersigned finds that Petitioner has not shown that any mental illness actually caused his procedural defaults.

Because Petitioner's assertions of cause fail, the undersigned need not reach the question of prejudice.

### *Exhaustion*

In the alternative, Petitioner asserts that his claims are not exhausted and that he is entitled to stay this action so he can return to state court and properly exhaust his claims. As noted above, Petitioner has utilized both of South Carolina's avenues for judicial relief — direct appeal and PCR proceedings. However, Petitioner asserts that, if the Supreme Court of South Carolina creates a state law equivalent to *Martinez v. Ryan*, and Petitioner successfully shows that his first PCR counsel provided inadequate assistance, then Petitioner may be able to file a second PCR application asserting the claims currently before this court.

At this time, however, the Supreme Court of South Carolina has not created a state law equivalent to *Martinez*. On the contrary, the Supreme Court of South Carolina has expressly stated that "the holding in *Martinez* is limited to federal habeas corpus review and is not applicable to state post-conviction relief actions." *Kelly v. State*, 745 S.E.2d 377, 377 (S.C. 2013). Thus, under current South

Carolina state law, "the contention that prior PCR counsel was ineffective is not per se a 'sufficient reason' allowing for a successive PCR application under [South Carolina Code Ann.] § 17-27-90." *Aice v. State*, 409 S.E.2d 392, 394 (S.C. 1991).    Accordingly, Petitioner has technically exhausted all available avenues of redress in state court.

### Merits

In accordance with the procedural analysis above, the undersigned recommends dismissing the petition as procedurally barred.    However, should the court conclude that the Supreme Court of South Carolina reached the merits of Petitioner's claims in its summary dismissal orders, for the following reasons, the undersigned would recommend granting Respondents' motion for summary judgment on all of Petitioner's claims, except for a portion of Ground Ten.

Claims adjudicated on the merits in a state court proceeding cannot be a basis for federal habeas corpus relief unless the state court's decision was "contrary to, or involved an unreasonable application of clearly established federal law as decided by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (2).

### Grounds One – Three: Competency

Relevant Facts[12]

At a pre-trial hearing before Judge Pieper on July 23, 2003, there was an extensive colloquy on Petitioner's motion to represent himself. (*See* App. 3900-3945).  Petitioner noted he had finished high school and had taken some college coursework and had also educated himself on the criminal justice system by studying the Constitution, PCR materials, trial proceedings, and statutes.  He

---

[12]    These facts are adopted from the PCR court's order dismissing Petitioner's amended PCR application. (*See* App. 5180-5196).

noted that he had done PCR work for other inmates and filed numerous motions in his own case. Petitioner stated that his lawyers had given him a document on the dangers of self-representation. At this hearing, the trial court discussed with Petitioner that by waiving counsel, he was waiving it for the entire case and that he might find himself shocked and dazed if faced with proceeding to the penalty phase. Despite the court's warnings, Petitioner remained adamant in his desire to represent himself. The court specifically observed that Petitioner was very coherent and indicated that it would allow him to proceed *pro se*, pending a *Blair*[13] hearing.

The *Blair* hearing took place on August 1, 2003. At the hearing, Dr. Donna Schwartz-Watts, the defense psychiatrist, testified that she felt Petitioner was not competent to represent himself based on her assessment of his paranoia, psychosis, and the reasons he provided for wanting to represent himself. Specifically, Dr. Schwartz-Watts stated that at their third interview Petitioner was psychotic and not in touch with reality, and he had since refused to see her. She felt that Petitioner did not have the capacity to assist his attorneys because he thought they were conspiring with the solicitor. She also felt that he did not have the capacity to look at different decisions about how to defend himself because he refused to consider any kind of mental health mitigation.

On cross-examination by the solicitor and in response to questions from Judge Pieper, Dr. Schwartz-Watts stated that Petitioner's intelligence was sufficient, but that she was concerned with the reasoning behind some of his decisions – especially given Petitioner's belief that he could do a better job than his attorneys, and that his attorneys were Masons who were conspiring with the solicitor to deny him a fair trial because of his religious beliefs. Dr. Schwartz-Watts also testified to her belief that Petitioner's mental illness would preclude him from considering issues in mitigation. However, she also

---

[13] *State v. Blair*, 273 S.E.2d 536 (S.C. 1981).

stated that some of Petitioner's decisions about experts were "brilliant" and that he had some good and strong ideas about how to defend his case.

The defense psychologist, Dr. Jeffrey R. McKee, testified that Petitioner refused to see him, but that he had elevated scores on a portion of a psychological test, indicating defensiveness and underreporting of symptoms. On cross-examination by Petitioner, Dr. McKee agreed that Petitioner had average intelligence, no neuropsychological deficits, and no indications of malingering.

The court's psychiatrist and psychologist both found Petitioner competent to stand trial and criminally responsible. The psychiatrist, Dr. Richard Frierson, diagnosed Petitioner as having a personality disorder with narcissistic and anti-social traits, but noted that was not a major mental illness.

The court's psychologist, Dr. Jeffrey Musick, examined Petitioner four times and also agreed that he was competent to stand trial. On cross-examination by Petitioner, Dr. Musick stated that none of Petitioner's tests indicated that he was mentally retarded and agreed that while Petitioner exhibited some suspiciousness and distrustfulness, those traits were not altogether abnormal. Dr. Musick also noted that Petitioner was well aware of his rights.

Based on this expert testimony and his own observations of and interactions with Petitioner, the court found Petitioner competent. Specifically, the court stated:

> I have watched the defendant in court; I gave the defendant the opportunity to ask questions in these proceedings for the very purpose of evaluating the defendant's demeanor, his behavior, whether the defendant is rational, whether he has an appreciation of these proceedings. The defendant asked some questions when he was addressing the witnesses, the questions were pertinent. I think the defendant listened to the testimony, he referenced some of that testimony in his questions and there is evidence in the record from the psychiatric testimony that the defendant is competent to so proceed and the Court upon review of all of these – with the entire record finds that defendant does have such rational understanding of these proceedings and does have the ability to present his defense, that I find that he is competent to proceed.

(App. 4054-55).  After making this finding, the court again discussed the dangers of self-representation, particularly in a capital case.

For the remainder of that pre-trial proceeding, Petitioner was able to make and logically discuss a number of motions.  All of those motions were at least somewhat appropriately related to valid principles of law, and none were rambling or nonsensical.  Then, in *ex parte* proceedings, Petitioner cogently discussed his requests for experts, some of which the court granted.

The court held another pre-trial hearing on October 1, 2003, at which Petitioner raised a number of other appropriate motions and conducted an evidentiary hearing on his Fourth Amendment claims.

When the trial commenced on October 6, 2003, Petitioner successfully conducted extensive capital *voir dire*, engaged in jury selection, made a motion for a *Batson* hearing, and discussed parameters of the opening statement with Judge Pieper.  Petitioner gave a long but coherent opening statement and proceeded to engage in lengthy examinations of witnesses in an appropriate manner.  As the PCR court found, "A reading of the guilt phase shows that while [Petitioner] may have occasionally had trouble with Rules of Evidence and Rules of Civil Procedure, he had no trouble whatsoever during the guilt phase in maintaining proper demeanor in the Courtroom and displaying proper respect for the Court, opposing counsel, and the witnesses."  (App. 5189).

The only significant issue arose after closing arguments in the guilt phase.  While the jury was still deliberating, Petitioner's standby counsel informed the judge that Petitioner wished to continue to represent himself, but did not intend to participate in or even appear for the sentencing phase. Petitioner stated that he did not intend to present anything in mitigation and did not see how his presence would make a difference.  Specifically, Petitioner stated that he did not wish to participate in sentencing because:

> [I]t wouldn't have no bearing on me, because if I'm in prison for life,
> that's death to me.  I can never accept that.  You know, I don't find [a life
> sentence] as a easy or something positive or good in my situation.  Death
> would be more preferable than life until I die in - - in prison.

(App. 3455-56).  The court told Petitioner that he would have to be present for sentencing and explained the importance of presenting mitigating evidence.

Several more conversations regarding Petitioner's decision took place between Petitioner, the court, and Petitioner's standby counsel after the jury returned its guilty verdict.  During these conversations, Petitioner explained that he presented everything about himself he wanted the jury to know during the guilt phase, and he did not wish to add anything.  In addition, standby counsel noted that Petitioner decided to stop all mitigation investigation on August 1st, when he was appointed counsel of record. (App. 3495).  Petitioner re-asserted his desire to remain counsel of record, but not to be present in the courtroom for the sentencing phase, stating that if the judge required him to remain in the courtroom, he would be verbally disruptive.  Petitioner stated that he did not wish to see any of the witnesses and that he was "respectfully" ready to accept the jury's sentence. (App. 3516-18).

After much deliberation, the court decided that Petitioner had to be present in the courtroom, and the sentencing phase began.  After the solicitor asked the first question of his first witness, Petitioner stood up and recited, "Blessed be Yahweh, el Shaddai, Jehovah, God Almighty, the God of Abraham, Isaac, Ishmael, Jacob, and Jesus."  The court asked Petitioner to take a seat, which he did, and the solicitor tried to ask his question again.  Petitioner stood up a second time and recited the same phrase.  The court ordered the jury to step out, and Petitioner told the court that he intended to continue to disrupt the proceedings.  The court warned Petitioner that if he disrupted the proceedings again, he would be removed from the courtroom.  The court brought the jury back in, the solicitor started his questioning, and Petitioner stood up and recited the same phrase.  The court sent the jury out

again and ordered the Petitioner confined to a room at the back of the courtroom where he could see and hear the proceedings.

Although given the opportunity to return to the front of the courtroom, Petitioner chose to remain in the glass room until his own closing argument. During the State's closing argument, Petitioner objected twice through standby counsel. Then, Petitioner gave a fairly lengthy closing statement to the jury, in which he apologized to the victim's families. Much like his arguments during the guilt phase, Petitioner's closing statement was logical, appropriate, and relevant to the issues. After finishing his closing statement, Petitioner returned to counsel table for the rest of the case. (App. 3829-40). Petitioner remained calm and coherent after the sentencing phase verdict, renewing his motions, apologizing again to the families, and thanking the trial judge. (App. 3871-73).

<u>Legal Standard</u>

In Grounds One through Three, Petitioner raises both procedural and substantive competency claims. The Fourteenth Amendment's Due Process Clause prohibits states from trying and convicting mentally incompetent defendants. *See Pate v. Robinson*, 383 U.S. 375, 384-86 (1966). A defendant is competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960).

To prevail on a procedural competency claim, "the petitioner must establish that the state trial court ignored facts raising a 'bona fide doubt' regarding the petitioner's competency to stand trial." *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000) (citing *Pate*, 383 U.S. at 384-86). "Even if a petitioner is mentally competent at the beginning of the trial, the trial court must continually be alert for changes which would suggest that he is no longer competent." *Id.* (citing *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). Although there are "no fixed or immutable signs which invariably indicate the need

for further inquiry to determine fitness to proceed," "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant." *Drope*, 420 U.S. at 180.

On the other hand, a petitioner raising a substantive competency claim must demonstrate his incompetency by a preponderance of the evidence. *Burket*, 208 F.3d at 192. "Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir. 1984). "Likewise, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Burket*, 208 F.3d at 192.

<u>Ground One</u>

In Ground One, Petitioner asserts that he was deprived of a fair and reliable determination of the appropriate sentence at the penalty phase of his capital trial because the trial judge failed to inquire into his competency. In support of this procedural competency claim, Petitioner primarily relies on the following evidence: (1) Dr. Schwartz-Watts and Petitioner's counsel disputed Petitioner's competency prior to the trial; (2) the trial judge himself acknowledged that the stress of a capital trial could affect Petitioner's competence; and (3) Petitioner's behavior and demeanor became increasingly irrational and less coherent as the trial progressed. (Doc. # 31 at 19-20). Petitioner argues that the combined effect of these circumstances was to raise a bona fide doubt as to his competence so that the trial judge's failure to re-evaluate Petitioner's competence violated due process. The undersigned does not agree.

While Petitioner's counsel did initially question his competence, the trial judge responded appropriately by holding a thorough *Blair* hearing. Only after considering extensive expert testimony

and his own observations of Petitioner did the trial judge find Petitioner competent to stand trial and to proceed *pro se*.  In addition, the record does not suggest that Judge Pieper did not afford Dr. Schwartz-Watts's testimony and opinion appropriate weight, only that he considered her opinion in combination with three other expert opinions and came to a different conclusion.  Based on the undersigned's review of the record, Judge Pieper's initial finding that Petitioner was competent was not unreasonable.

In addition, the undersigned does not find Judge Pieper's warnings to Petitioner regarding the dangers of self-representation indicative of Petitioner's actual competency or the judge's view of Petitioner's competency.   These exchanges show that Judge Pieper was acutely aware of his responsibility as a trial judge to ensure that Petitioner made a fully informed decision and serve only to add credibility to Judge Pieper's findings of competence.

Finally, the court does not agree that Petitioner's demeanor at the end of the guilt phase raised a bona fide doubt as to his competence.  In support of his assertion to the contrary, Petitioner points to three events that he argues should have triggered the trial court's duty to inquire into Petitioner's competency:  (1) waiver of the twenty-four hour cooling off period; (2) refusal to participate in the sentence phase; and (3) Petitioner's religious chant.  From the record, it appears that Petitioner made calculated, rational decisions about each of these events.  In addition, all three events appear consistent with Petitioner's decision, apparently made as early as August 1, 2003, over two months earlier, to not engage in a mitigation investigation and his strong desire to control his own case.  While the undersigned would not promote Petitioner's decisions as sound trial strategy, "bad trial tactics do not prove a defendant incompetent." *Wise v. Bowersox*, 136 F.3d 1197, 1204 (8th Cir. 1998).

In sum, taken individually or together, the circumstances surrounding Petitioner's trial at no point raised a bona fide doubt as to Petitioner's competency.  Thus, the Supreme Court of South

Carolina could have reasonably found that the trial judge had no duty to inquire further into Petitioner's competency.

Ground Two

In Ground Two, Petitioner asserts that he was actually incompetent throughout the guilt phase of his trial and, thus, suffered a violation of his right not to be tried or convicted while incompetent. Petitioner's assertion rests on an evaluation from Dr. Rikki Lynn Halavonich, a forensic psychiatrist. (Doc. # 31-1, Halavonich Ltr). Dr. Halavonich evaluated Petitioner on March 31, 2010, and again on May 24, 2010. Her opinion, expressed in a letter to Petitioner's counsel, is based on these evaluations and her review of the trial transcripts and a number of other records. Petitioner originally filed Dr. Halavonich's evaluation with his petition for a writ of certiorari and his state habeas petition.

Dr. Halavonich's evaluation expresses her opinion that Petitioner's symptoms are consistent with Temporal Lobe Epilepsy and that "[a]lthough determined to be competent prior to the initiation of the trial, [Petitioner's] documented behaviors, particularly just prior to and during the penalty phase of the trial, indicate his mental status had then declined to an extent consistent with a lack of capacity to rationally understand the proceedings or participate in his defense at that point in time." (Doc. # 31-1, Halavonich Ltr at 4). Petitioner asserts that Dr. Halavonich's post-conviction letter and Dr. Schwartz-Watts's opinion provide "clear, strong, and uncontradicted" evidence of Petitioner's incompetence and present a "facially meritorious claim for relief." (Doc. # 64 at 47).

However, the record does contain contradictory evidence. As noted in the factual discussion and analysis of Ground One above, the record is replete with evidence of Petitioner's competence, including the trial court's findings based on personal observations and live expert testimony. Taking the record as a whole, including the Halavonich letter, the Supreme Court of South Carolina's finding that Petitioner remained competent throughout his trial would not be unreasonable.

29

<u>Ground Three</u>

In Ground Three, Petitioner asserts that the trial judge failed to secure a knowing, voluntary, and intelligent waiver of Petitioner's right to present mitigating evidence. The undersigned finds this ground entirely without merit.

The Supreme Court of the United States has "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." *Schriro v. Landrigan*, 550 U.S. 465, 479 (2007). Nor has the Court ever "required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." *Id.* Accordingly, the state court's summary dismissal of this claim on the merits would not constitute an unreasonable application of clearly established federal law.

***Grounds Four & Five: Removal from Courtroom, Pro Se Status, and Shackles***

<u>Relevant Facts</u>

After Petitioner's first outburst during the sentencing phase, with the jury out of the room, the trial judge warned Petitioner that he would put him in a back room if he continued to be disruptive. (App. 3552). Petitioner responded that he would be disruptive back there as well (*Id.*). The judge told Petitioner that if he further disrupted the proceedings, he may be shackled or gagged. (App. 3553).

After Petitioner's second outburst, the trial judge sent the jury out of the room and ordered that Petitioner be placed in a conference room at the back of the courtroom with a glass partition so he could observe the proceedings. (App. 3556). Again, the trial judge warned Petitioner that if he was disruptive again, he would be gagged. (App. 3557). At the trial judge's direction, Petitioner was initially restrained, but the restraints were removed before the jury returned to the courtroom. (*See* Doc. # 44-15 at 4, *State v. Roberts*, 632 S.E.2d 871, 873 (S.C. 2006)).

The trial judge explained his decision to remove Petitioner from the courtroom on the record as follows:

> Let the record reflect that the defendant once again has disrupted these proceedings with his outburst contrary to the court's previous warnings. The court said it would not give him further warning.
>
> The court will place him in a room at the back of the courtroom that has a glass partition to allow him to hear all of the proceedings. He can also see the proceedings as he desires. There's a system that feeds into the room that allows him to hear all of the testimony.
>
> Previously the defendant indicated he did not wish to be here. He has authorized stand-by counsel to interject objections, handle the exhibits, and make the closing statement if necessary.
>
> Because he continues to maintain that he will constantly interrupt these proceedings, the court has taken this action.
>
> The court has also warned the defendant that if necessary he will be gagged.
>
> We will put him back in the room and see if he - - if he has another outburst. Then at that point we will take the step of actually gagging him, which I hope we do not have to do.

(App. 3556-57). Throughout sentencing, the judge offered to allow Petitioner to return to the courtroom if he could do so without being disruptive. However, Petitioner indicated that he preferred to remain in the back room. (App. 3596-97, 3681, 3738). Ultimately, Petitioner returned to the courtroom, unrestrained, to make his closing statement to the jury.

Ground Four

In Ground Four, Petitioner asserts that the trial judge erred in failing to terminate his *pro se* status. Specifically, Petitioner argues that his outbursts and unwillingness to participate in the penalty phase of his trial "provided the trial court with ample reason and justification to revoke" his *pro se* status. (Doc. # 31 at 30). Further, Petitioner asserts that by appointing standby counsel, but restricting

their role and allowing Petitioner to continue *pro se*, the trial court "ensured that Petitioner would receive less protection than the law afforded him and guaranteed a sentence of death." (*Id.*).

While a competent criminal defendant has a right to proceed without counsel, *see Faretta v. California*, 422 U.S. 806, 807 (1975), that right is not absolute, *see Martinez v. Court of Appeal of California*, 528 U.S. 152, 161-62 (2000). A trial court may "terminate self-representation or appoint 'standby counsel' – even over the defendant's objection – if necessary," such as when "the government's interest in ensuring the integrity and efficiency of the trial . . . outweighs the defendant's interest in acting as his own lawyer." *Id.*

However, a defendant who does not abide by courtroom protocol does not automatically forfeit his right to self-representation. *See Davis v. Grant*, 532 F.3d 132, 149 (2d Cir. 2008) (finding state court's failure to appoint standby counsel when defendant removed from courtroom not objectively unreasonable application of Supreme Court precedent); *Clark v. Perez*, 510 F.3d 382, 395-96 (2d Cir. 2008) (no Sixth Amendment violation where court did not revoke *pro se* status of defendant removed from courtroom because of conduct). Rather, "[n]o one formula for maintaining the appropriate courtroom atmosphere will be best in all situations," and "[t]rial judges . . . must be given sufficient discretion to meet the circumstances of each case." *Illinois v. Allen*, 397 U.S. 337, 343 (1970).

"[T]he balance between a defendant's right to self-representation and the need to 'ensur[e] that evidence admitted against [him] is reliable and subject to . . . rigorous adversarial testing' is a delicate matter." *Davis*, 532 F.3d at 140 (quoting *Maryland v. Craig*, 497 U.S. 836, 846 (1990)). In this case, after much deliberation and discussion with both Petitioner and standby counsel, the trial judge came to a resolution that, in his view, struck this delicate balance. By removing Petitioner from the courtroom, but placing him in an area where he could see and hear the proceedings and communicate with his standby counsel, the trial judge allowed Petitioner to maintain control of his own defense while

also discontinuing the disruptions.  In addition, Petitioner's standby counsel remained at the counsel table with instructions to object where necessary, further safeguarding the adversarial process.  On this record, the undersigned cannot conclude that the state supreme court's dismissal of this claim would be an objectively unreasonable application of clearly established Supreme Court precedent.

Ground Five

In Ground Five, Petitioner asserts that his death sentence violates the Fifth, Eighth, and Fourteenth Amendments because he was visibly shackled without justification and without an individualized determination by the trial judge.

"[C]ourts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding."  *Deck v. Missouri*, 544 U.S. 622, 633 (2005).  However, this rule is not absolute and "permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling."  *Id.* "But, any such determination must be case specific; that is to say, it should reflect particular concerns, say, special security needs or escape risks, related to the defendant on trial."  *Id.*  Further, "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation.  The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'"  *Id.* at 635 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

In *Deck*, the Supreme Court emphasized that the rule against shackling, especially in capital proceedings, is intended to combat potential prejudice, not to prevent trial judges from taking appropriate precautions in their courtrooms.  *See Deck*, 544 U.S. at 632 ("We are mindful of the tragedy that can result if judges are not able to protect themselves and their courtrooms.  But given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken

account of the circumstances of the particular case."). Accordingly, the Court's holding is limited to the use of *visible* shackles. *Id.* at 624 ("We hold that the Constitution forbids the use of visible shackles during the penalty phase . . . ."). Here, the Supreme Court of South Carolina expressly found that Petitioner's restraints were not visible to the jury. (Doc. # 44-15 at 4, *State v. Roberts*, 632 S.E.2d 871, 873 (S.C. 2006)). After a thorough review of the relevant portion of the record, the undersigned cannot say that the state court's dismissal of this claim would be an unreasonable determination of the facts or an unreasonable application of clearly established federal law.

### Grounds Six – Eight: Ineffective Assistance of Counsel

Grounds Six through Eight raise various claims of ineffective assistance of counsel. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient." *Id.* "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. As the Supreme Court has noted:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*. at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at —, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is

> substantial. 556 U.S. at —, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 131 S.Ct. at 788.

Ground Six

In Ground Six, Petitioner contends that he was deprived of his Sixth and Fourteenth Amendment right to the effective assistance of counsel when trial counsel failed to object to evidence of general prison conditions during the penalty phase of the trial. (Doc. # 31 at 36). Specifically, Petitioner states that attorneys Kelly and Thornton failed to object to statements made by Solicitor Stone during his closing argument and to statements by James Sligh, a South Carolina Department of Corrections official, about living conditions of prisoners in the general population of the South Carolina Department of Corrections. (App. 3636–39, 3794). Petitioner cites to *State v. Bowman*, 623 S.E.2d 378 (S.C. 2005), and *State v. Burkhart*, 640 S.E.2d 450, 453 (S.C. 2005) (also involving testimony by James Sligh), which hold that evidence relating to prison conditions is beyond the scope of what a jury should consider in determining whether a convicted defendant should be sentenced to death or to life without parole. (Doc. # 31 at 38).

The holding in *State v. Burkhart* is based on South Carolina law. As a general rule, issues of state law are not valid grounds for federal habeas corpus relief. *See Wright v. Angelone*, 151 F.3d 151, 156–58 (4th Cir. 1998); *Chance v. Garrison*, 537 F.2d 1212, 1215 (4th Cir. 1976); and *Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir. 1960); *cf. Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' . . . Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-

35

court determinations on state-law questions.") (citations omitted).  As this ground is based on state law, Ground Six provides no basis for granting federal habeas corpus relief.

Moreover, under *Faretta v. California*, 422 U.S. 806, 834 (1975), Petitioner was acting *pro se* during the trial and during the penalty phase.  As a result, the District Court should find that he is precluded from raising ineffective assistance of counsel claims with respect to Grounds Six, Seven, and Eight. In *Faretta*, the Court stated:

> We are told that many criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials. But the right of self-representation has been recognized from our beginnings by federal law and by most of the States, and no such result has thereby occurred. Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.  See *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353.  Of course, a State may—even over objection by the accused—appoint a "standby counsel" to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. *See United States v. Dougherty*, 154 U.S.App.D.C. 76, 87—89, 473 F.2d 1113, 1124—1126.
>
> The right of self-representation is not a license to abuse the dignity of the courtroom.  Neither is it a license not to comply with relevant rules of procedural and substantive law.  Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of "effective assistance of counsel."

*Faretta*, 422 U.S. at 834 n. 46.

Here, Petitioner was never relieved of his *pro se* status during the penalty phase. (*See* Doc. # 43 at 66).  Hybrid representation in South Carolina courts is precluded under cases such as *State v. Stuckey*, 508 S.E.2d 564, 564–65 (S.C. 1998) (stating there is no right to hybrid representation under the South Carolina Constitution or the Sixth Amendment of the U.S. Constitution).  The United States Court of Appeals for the Fourth Circuit has also held that "a *pro se* defendant has no right to standby

36

counsel when he chooses to proceed *pro se*." *United States v. Beckton*, 740 F.3d 303, 307 (4th Cir. 2014) (citing *United States v. Singleton*, 107 F.3d 1091, 1100 (4th Cir. 1997) (right to counsel and right to represent oneself are "mutually exclusive")).

The Courts of Appeals to address the matter have held that, under *Faretta*, since there is no constitutional right to standby counsel, no claim of ineffective assistance of counsel can arise from standby counsel. *See*, *e.g.*, *United States v. Morrison*, 153 F.3d 34, 55 (2d Cir. 1997) ("Morrison claims that his standby counsel ineffectively assisted him. We have held that 'there is no constitutional right to hybrid representation . . . where [the defendant] shared the duties of conducting her defense with a lawyer.' . . . [W]ithout a constitutional right to standby counsel, a defendant is not entitled to relief for the ineffectiveness of standby counsel.") (citation omitted); *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997) ("Absent a constitutional right to standby counsel, a defendant generally cannot prove standby counsel was ineffective.") (citations omitted); *United States v. Windsor*, 981 F.2d 943, 947 (7th Cir. 1992) ("This court knows of no constitutional right to effective assistance of standby counsel.).

Grounds Six through Eight arise out of Petitioner's decision to represent himself at trial, a right guaranteed by the holding in *Faretta*, 422 U.S. at 836 ("In forcing Faretta, under these circumstances, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense."). Since the Court of General Sessions, under *Faretta*, was required to allow Petitioner to proceed *pro se* in his death penalty trial, the District Court should find that no valid ineffective assistance of counsel claim has been raised, despite the presence of standby counsel. Although the United States Court of Appeals for the Fourth Circuit has not decided the specific matter, it is recommended, in light of the decision of the Court of Appeals in *Beckton*, 740 F.3d at 307 (a direct appeal holding that there is no right to hybrid representation), that the

District Court follow the reasoning of the United States Courts of Appeals for the Second and Seventh Circuits and hold that, since there is no right to hybrid representation, a claim for ineffectiveness of standby counsel does not arise where the criminal defendant, of his or her own choice, is proceeding *pro se* in a criminal trial, including the penalty phase. *See*, *e.g.*, *Morrison*, 153 F.3d at 55; *Schmidt*, 105 F.3d at 90; *Windsor*, 981 F.2d at 947.   *See also Allen v. Warden, Keen Mountain Corr. Center*, No. 1:13cv726, 2014 WL 1613455, at *6 (E.D. Va. April 22, 2014) ("[B]ecause a defendant has no right to standby counsel, he has no right to effective standby counsel." (citing *Schmidt*, 105 F.3d at 90)). *Hargrove v. U.S.*, C.A. No. 3:12-cv-124, 2013 WL 6148071, at *3 (N.D. W. Va.  Nov. 22, 2013) ("There is no constitutional right to effective assistance of standby counsel." (citing *Windsor*, 981 F.2d at 947)).

Based upon the foregoing, the state court's denial of this claim on the merits would not in itself constitute an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.

<u>Ground Seven</u>

In Ground Seven, Petitioner contends that he was deprived of his Sixth and Fourteenth Amendment rights to effective assistance of counsel by trial counsel's failure to object to the "extensive amount of victim impact evidence" introduced at the penalty phase. (Doc. # 31 at 40).  Petitioner contends that Ground Seven, though not raised in the application for PCR, was exhausted by the filing of the petition for writ of habeas corpus filed in the original jurisdiction of the Supreme Court of South Carolina on February 18, 2011. (Doc. # 31 at 45-46).  According to Petitioner, the introduction of this evidence, though allowable under *Payne v. Tennessee*, 501 U.S. 808 (1991) (victim impact evidence

allowable), violated the holding in *Booth v. Maryland*, 482 U.S. 496 (1987), which was not overruled by *Payne*, 501 U.S. at 830 n. 2. (Doc. # 31 at 41–42).

Moreover, Petitioner contends that trial counsel's failure to object "created an impermissible risk that the jury's decision was based on emotion, sympathy, and a desire to comply with the wishes of the victim's family" and was unreasonable and prejudicial to Petitioner under *Strickland v. Washington*, 466 U.S. 668 (1984). (Doc. # 31 at 44). Petitioner also states that the victim impact statements violated his Due Process rights because they failed to observe the fundamental fairness essential to the very concept of justice under *Lisenba v. California*, 314 U.S. 219 (1941). (Doc. # 31 at 44 n.13).

Respondents contend that this ground is also procedurally defaulted and note that Petitioner was never relieved of his *pro se* status during the penalty phase. (Doc. # 43 at 67-68). Respondents also argue that under *Payne v. Tennessee,* and under state cases such as *State v. Rocheville*, 425 S.E.2d 32, 36 (S.C. 1993), *State v. Hughey*, 529 S.E.2d 721, 730–31 (S.C. 2000), *State v. Ivey*, 481 S.E.2d 125 (S.C. 1997), and *State v. Byram*, 485 S.E.2d 360 (S.C. 1997), the victim impact evidence was admissible. (Doc. # 43 at 69). Respondents also rely on *United States v. Wilson*, 493 F. Supp. 2d 364 (E.D.N.Y. 2006), a federal death penalty case concerning the murder of an undercover officer, to show that a State may introduce evidence of the crime's impact on the community at large to counteract or rebut a defendant's mitigating evidence. (Doc. # 43 at 69). Also relevant, according to Respondents, are cases from outside this district and circuit upholding admissibility of the effect of a law enforcement officer's murder in the penalty phase of a trial. (*Id*. at 69–70).

Respondents argue that, since the victim impact evidence was admissible under both state and federal case law, "an objection would be fruitless." (*Id*. at 70). Respondents rely on *Hough v.*

*Anderson*, 272 F.3d 878 (7th Cir. 2001), which holds that an ineffective assistance of counsel claim arising out of a failure to object to admissible evidence fails both prongs of the *Strickland* test because the failure to object was not deficient or prejudicial. (Doc. #43 at 70).

As indicated in the previous discussion of Ground Six, the Court of General Sessions, under *Faretta*, was required to allow Petitioner to proceed *pro se* in his death penalty trial, so no valid ineffective assistance of counsel claim has been raised, despite the presence of standby counsel.  In fact, the transcript of the sentencing phase reveals that Petitioner told the trial court on several occasions that he did not want his standby counsel to become counsel of record during the sentencing phase. (App. 3454–58, 3494–3505, 3532–36).

The transcript indicates that Petitioner authorized standby counsel to make objections. (App. 3518–20, 3538–42, 3861).  This authorization for standby counsel to make objections did not relieve Petitioner of his *pro se* status at the sentencing phase. Under longstanding South Carolina law, *see Stuckey*, 508 S.E.2d at 564–65, hybrid (*pro se* and counsel) representation is not allowed.  As indicated in the discussion of Ground Six, there is no right to hybrid representation. *See Beckton*, 740 F.3d at 307; *Morrison*, 153 F.3d at 55; *Schmidt*, 105 F.3d at 90; *Windsor*, 981 F.2d at 947. Accordingly, the District Court should follow the reasoning of the United States Courts of Appeals for the Second and Seventh Circuits and hold that, since there is no right to hybrid representation, a claim for ineffectiveness of standby counsel does not arise where the criminal defendant, of his or her own choice, is proceeding *pro se* in a criminal trial, including the penalty phase.

Moreover, even if this court deemed the presence and limited participation of standby counsel to constitute actual representation during the penalty phase, the Court of Appeals has held that failure of counsel to object to admission of repetitive or cumulative evidence in the sentencing phase of

a capital murder case did not prejudice the defendant. *See Bowie v. Branker*, 512 F.3d 112, 123 (4th Cir. 2008) ("We conclude that the MAR court did not unreasonably apply Supreme Court precedent in concluding that counsel's failure to appeal the admission of Rochelle's statement did not prejudice Bowie in his sentencing.").[14]

It appears that Petitioner is attempting to infer that standby counsel's failure to object to victim impact evidence during the penalty phase allowed the prosecution, so to speak, to "pile on" more victim impact evidence. A failure to object to admission of corroborative or cumulative evidence does not constitute ineffective assistance of counsel. *See*, *e.g.*, *Muhammad v. Kelly*, 575 F.3d at 370; *Whitley v. Bair*, 802 F.2d 1487, 1493–94 (4th Cir. 1986) (pre-AEDPA case). Moreover, Petitioner's failure to assist his standby counsel and his failure to participate meaningfully in the penalty phase can refute a claim of ineffective assistance of counsel. *See Schriro v. Landrigan*, 550 U.S. 465, 478 (2007); *Gardner v. Ozmint*, 511 F.3d 420, 427 (4th Cir. 2007).

Thus, the state court's denial of this claim on the merits would not in itself constitute an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.

---

[14] A "Motion for Appropriate Relief" ("MAR") is the State of North Carolina's equivalent for what in South Carolina is known as an Application for Post-Conviction Relief. *See State v. Sullivan*, 717 S.E.2d 581, 584 (N.C.App. 2011); and N.C. Gen.Stat. § 15A–1420 (Westlaw 2014).

Ground Eight

In Ground Eight, Petitioner contends that he was deprived of his Sixth and Fourteenth Amendment rights to the effective assistance of counsel when trial counsel failed to object to inflammatory and improper statements made during the prosecution's closing argument, which rendered the sentencing phase fundamentally unfair. (Doc. # 31 at 46).  Petitioner cites, *inter alia*, *Darden v. Wainwright*, 477 U.S. 168, 178–79 (1986), and *Viereck v. United States*, 318 U.S. 236 (1943), and contends that the use of a war analogy at App. 3791–92 and App. 3801–02 infected the penalty phase with unfairness. (Doc. # 31 at 47). Petitioner also contends that Ground Eight was exhausted in the habeas petition (No. 2011-185866) filed in the original jurisdiction of the Supreme Court of South Carolina on February 18, 2011, and that the "state court's summary dismissal of this claim constituted both an unreasonable determination of the facts in light of the record that was before the court, and an unreasonable application of clearly established federal law."  (Doc. # 31 at 47–48).

As with Grounds Six and Seven, Respondents state that Ground Eight is procedurally defaulted.  They also argue that, since there is no right to hybrid representation, under *Faretta* and cases from the Second and Seventh Circuits, there can be no valid claim of ineffective assistance of counsel when a defendant is proceeding *pro se.* (Doc. # 43 at 71–72). Respondents also contend that the claims do not warrant relief because each side was allowed to make their own arguments, juries are presumed to follow their instructions, and there was no prejudice to Petitioner. (*Id.* at 73–74). Respondents also argue that *Viereck v. United States* is inapposite on the facts because *Viereck* concerned a violation of the Foreign Agents Registration Act during a declared war, not the murder of two people. (Doc. # 43 at 74–75).  Respondents also rely on the curative instruction at App. 3856–57. (Doc. # 43 at 75).

As with Grounds Six and Seven, the District Court should follow the reasoning of the United States Courts of Appeals for the Second and Seventh Circuits, and hold that, since there is no right to hybrid representation, a claim for ineffectiveness of standby counsel does not arise where the criminal defendant, of his or her own choice, is proceeding *pro se* in a criminal trial, including the penalty phase.

Furthermore, a federal court, when reviewing alleged acts of prosecutorial misconduct, must determine "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden*, 477 U.S. at 181 (concerning a prosecutor's improper closing argument in guilt phase of death penalty trial).  A prosecutor's remarks do not rise to that level merely by being "offensive" or "improper."  "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned."  *Id.* at 180–81 (internal quotation marks omitted). Instead, the standard is the "narrow one of due process, and not the broad exercise of supervisory powers."  *Donnelly v. DeChristofo*, 416 U.S. 637, 642 (1974).  To prevail under this standard, the defendant in a criminal case must show that "the prosecutor's remarks or conduct were improper and, second . . . that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial."  *United States v. Scheetz*, 293 F.3d 175, 185 (4th Cir. 2002); *see also United States v. Wilson*, 135 F.3d 291, 297 (4th Cir. 1998).

The "war" analogy used in the prosecution's closing argument does not rise to the level contemplated by the Supreme Court in *Darden* and *Donnelly.  See Darden*, 477 U.S. at 179 ("The prosecutors then made their closing argument.  That argument deserves the condemnation it has received from every court to review it, although no court has held that the argument rendered the trial unfair."). *Viereck*, which is cited by Petitioner, is not on point because there is no evidence that the prosecutor in

43

Petitioner's criminal case was attempting to associate Petitioner with enemies of the United States in a declared war.  Moreover, even if the prosecutor's war analogy was deemed to be improper, the comments did not infect the trial with unfairness as to make the resulting death sentence a denial of due process, as required by *Wilson*, 135 F.3d at 297.  There is no indication that the prosecutor offered the remarks with an intention to mislead the jury or that the remarks otherwise diverted the jury's attention from the evidence during the penalty phase.  Hence, the prosecutor's use of a war analogy provides no basis for habeas relief.  *See United States v. Caro*, 597 F.3d 608, 624–25 & n. 7 (4th Cir. 2010) ("Our concerns [about the prosecutor's comments] notwithstanding, on these facts we cannot find such prejudice as to warrant reversal.") (direct appeal in a federal death penalty trial).

Thus, the state court's denial of this claim on the merits would not in itself constitute an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.

### Ground Nine: Discriminatory Peremptory Challenges

In Ground Nine, Petitioner asserts that the prosecution exercised its peremptory challenges in a racially discriminatory manner in violation of his Sixth and Fourteenth Amendment rights.

After jury selection, Petitioner requested a *Batson*[15] hearing.  At the hearing, Petitioner objected to the strikes used by the State against four jurors.  First, Petitioner challenged the strike of Juror No. 286.  The solicitor argued that he dismissed Juror No. 286 because he "had the impression that she was afraid of" Petitioner.  The solicitor also noted that Juror No. 286 was weak on the death penalty and stated during *voir dire* that she knew nothing about the case.  (App. 1340).  The trial court found that the solicitor had proffered a facially neutral explanation.  Petitioner asserted that Juror No. 229 was

---

[15] *Batson v. Kentucky*, 476 U.S. 79 (1986)

similarly situated, arguing that Juror No. 229 would be afraid of the prosecution, or at least the prosecution's authority. (App. 1341). The trial court found that Juror No. 229 was not similarly situated and denied the *Batson* motion as to Juror No. 286.

Second, Petitioner challenged the strike of Juror No. 297. (App. 1342). The solicitor stated he struck Juror No. 297 because the juror indicated that he knew one of the defense witnesses. (*Id.*). In addition, the solicitor noted that Juror No. 297 was weak on the death penalty and had heard about the incident. (*Id.*). The trial court found these reasons facially neutral. Initially, Petitioner argued that Juror No. 321 was similarly situated, but then argued that Juror No. 273 was similarly situated because she indicated that she knew the solicitor. The trial judge found that knowing the solicitor was not equivalent to knowing a defense witness and denied the *Batson* motion as to Juror No. 297.

Third, Petitioner challenged the strike of Juror No. 95. The solicitor stated that Juror No. 95 was from the solicitor's hometown; he knew Juror No. 95's brother; his wife taught at Juror No. 95's high school for over twenty years; and the solicitor had prosecuted Juror No. 95's brother for criminal sexual conduct. (App. 1349-50). The court found those facially neutral reasons. Petitioner did not contend that the solicitor had prosecuted any other juror's family member. So, the trial court denied the *Batson* motion as to Juror No. 95. (App. 1351).

Fourth, Petitioner challenged the strike of Juror No. 45. (App. 1351). The solicitor stated that he struck Juror No. 45 because that juror was connected to a pending criminal domestic violence charge and Petitioner's case arose out of an incidence of criminal domestic violence. (*Id.*). The trial court found this reason facially neutral. (App. 1351-52). Petitioner did not assert that any member of the jury was similarly situated, and the trial court denied the *Batson* motion as to Juror No. 45. (App. 1352-53).

The Fourteenth Amendment's Equal Protection Clause makes it unconstitutional to strike a juror on the basis of race or gender. *Batson*, 476 U.S. at 96-98. When a party asserts a *Batson* violation, the court must analyze the assertion in three steps:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008) (alteration in original) (citing *Miller-El v. Dretke*, 545 U.S. 231, 277 (2005)).

Petitioner argues that the trial judge clearly erred at the third step because the solicitor's proffered justifications were not believable. *See Hernandez v. New York*, 500 U.S. 352, 365 (1991) ("the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed"). "[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El*, 545 U.S. at 338-39. "[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Id.* at 339. Due to the trial court's superior position to determine credibility, "a state court's finding of the absence of discriminatory intent is 'a pure issue of fact' accorded significant deference." *Id.* (quoting *Hernandez*, 500 U.S. at 365). Moreover, reflecting the need for deference, under § 2254 review, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Id.* at 340.

Petitioner has offered evidence of other similarly situated jurors and of an alleged history of discriminatory use of peremptory strikes by the solicitor's office. The court has reviewed this evidence and the transcript and does not find reason to overturn the state court's determination. Thus, based on the record before it, the court cannot find that the state court unreasonably applied clearly established federal law or an unreasonable determination of the facts.

### Ground Ten: Prejudicial Extraneous Influences

In Ground Ten, Petitioner asserts that he was denied his Sixth and Fourteenth Amendment right to a fair and impartial jury as a result of multiple prejudicial, extraneous influences on the jury. Specifically, Petitioner, based on affidavits from law students reciting information received in interviews with the jurors, asserts that during their penalty deliberations, jurors relied heavily on religion: several jurors held hands and prayed; some jurors brought Bibles and copies of Scripture they had reproduced in the jury room; jurors relied on specific Bible passages to help decide if Petitioner would get the death penalty; and one juror reported consulting with a minister for guidance. (Doc. # 44-40 at 87-91). In addition, after discovering dog excrement in the jury box, the jurors were informed by court personnel that the excrement came from a bomb-sniffing dog brought in because of threats from Petitioner's associates. (*Id.*).

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to trial by an impartial jury. *See* U.S. Const. amend VI. An impartial jury is one that arrives at its verdict "based on the evidence developed at trial" and without external influences. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "No right touches more the heart of fairness in a trial," *Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1988), "and this right applies equally to sentencing proceedings that are tried to a jury," *Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014).

Because of the importance of this right, "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." *Remmer v. U.S.*, 347 U.S. 227, 229 (1954). However, this presumption is not conclusive, and "the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id.*

Thus, "not every allegation of an unauthorized communication between a juror and a third party will trigger the *Remmer* presumption and its corresponding hearing requirement." *Barnes*, 751 F.3d at 244. Rather, "the *Remmer* presumption and hearing requirement are triggered after the party attacking the verdict satisfies the 'minimal standard' of showing that 'extrajudicial communications or contacts [between a juror and a third party] were more than innocuous interventions.'" *Id.* at 245 (quoting *United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996)). In determining the nature of the third-party contact, courts refer back to the factors recited in *Remmer*: any private communication; any private contact; any tampering; directly or indirectly with a juror during trial; about the matter before the jury. *See Cheek*, 94 F.3d at 141 (citing *Remmer*, 347 U.S. at 229).

Reference to Bible Passages

It would not have been unreasonable for the state court to conclude that allegations that jurors relied on passages from the Bible or prayed together did not amount to a prejudicial extraneous influence triggering the need for a *Remmer* hearing. The Fourth Circuit has found that "the Bible is not an 'external' influence." *Robinson v. Polk*, 438 F.3d 350, 364 (4th Cir. 2006). Rather, "the reading of Bible passages invites the listener to examine his or her own conscience from within." *Id.* at 363. Thus,

the state court could have reasonably concluded that allegations of the physical presence and reading of the Bible in the jury room did not automatically warrant an investigation.

Fear of Retaliation

Similarly, the state court could have reasonably concluded that the jurors receiving information about the presence of a bomb-sniffing dog did not warrant a hearing. While that information came from a third-party—court personnel—it did not concern a matter before the jury and, thus, the contact does not fall under *Remmer*.

Third-Party Contact

Lastly, Petitioner alleges that a juror consulted with her minister during deliberations. Petitioner presents his allegation in an affidavit from a law student who interviewed the juror. In the affidavit, the law student states: "one juror stated that in addition to praying, she asked a minister for guidance on how to make a decision during the sentencing phase." (Doc. # 44-40 at 89-90).

Respondents assert that this affidavit is not enough to trigger a *Remmer* hearing because it fails to identify the juror who allegedly made the statement, from whom she requested guidance, and what, if any, guidance she received. However, the undersigned does not find a requirement for such a specific showing in the relevant precedent. *See, e.g., Hurst v. Joyner*, 757 F.3d 389, 398 (4th Cir. 2014) ("The affidavits did not allege that [the juror] discussed with her father the facts or evidence that had been presented in the trial, or the status of the juror's deliberations. Nor was there any evidence that [the juror's] father expressed any opinion about the case or attempted to influence her vote. Nevertheless, [Petitioner] presented a credible allegation of a private communication about the matter pending before the jury, entitling [Petitioner] to the presumption of prejudice and an evidentiary hearing.").

Rather, the record supports a finding that Petitioner made the requisite showing. While the affidavit does not offer much in the way of detail, it does clearly allege that a juror engaged in

private communication with a third-party. In addition, the juror sought "guidance on how to make a decision during the sentencing phase." During the sentencing phase of Petitioner's trial, the matter being decided was whether to impose a sentence of life imprisonment or a sentence of death. Thus, the affidavit alleges a private communication about the matter pending before the jury. *See Barnes*, 751 F.3d at 248-49.

Accordingly, should the court find that this claim is not procedurally defaulted, the undersigned recommends that the court deny Respondents' motion for summary judgment as to this portion of this claim to allow for limited evidentiary development.

## **<u>RECOMMENDATION</u>**

For the foregoing reasons, the undersigned recommends that the court grant Respondents' motion for summary judgment and dismiss the petition for habeas corpus as procedurally barred. In the alternative, should the court find that the Supreme Court of South Carolina reached the merits of Petitioner's claims, the undersigned recommends denying summary judgment as to Ground Ten, to the extent that it alleges improper third-party contact, and granting summary judgment as to all other grounds.

s/ Kevin F. McDonald
United States Magistrate Judge

November 5, 2014
Greenville, South Carolina