UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Abdiyyah Ben Alkebulanyahh | ) | |
| (*fka* Tyree Alphonso Roberts), | ) | C/A No. 6:13-cv-00918-TLW |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| William Byars, Jr., *Commissioner South* | ) | |
| *Carolina Department of Corrections*; Wayne | ) | |
| C. McCabe, *Warden of Lieber Correctional* | ) | |
| *Institution*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| _____ | ) | |

**ORDER**

This is a capital habeas corpus action brought pursuant to 28 U.S.C. § 2254. Petitioner Abdiyyah Ben Alkebulanyahh ("Petitioner") filed this petition for writ of habeas corpus on February 13, 2014, (ECF No. 31) and Respondents moved for summary judgment on April 17, 2014, (ECF No. 45). On November 5, 2014, in accordance with 28 U.S.C. § 636(b)(1)(A)(B) and Local Rule 73.02(B)(2)(c), DSC, United States Magistrate Judge Kevin McDonald issued a Report and Recommendation ("Report") on Respondents' motion. (ECF No. 75).

The Report recommends dismissing the petition as procedurally barred. However, to aid the court, the Report also reviews the merits of Petitioner's claims. Based on that merits review, the Report recommends that, should the Court not find the petition procedurally defaulted, the Court should grant Respondents' motion for summary judgment as to all of Petitioner's habeas grounds, except one portion of Ground Ten, in which Petitioner alleges that he was denied his Sixth and Fourteenth Amendment right to a fair and impartial jury because one juror consulted

with a minister regarding the case. Both parties filed objections to the Report (ECF Nos. 76, 79), and Petitioner responded to Respondents' objections (ECF No. 85).

As to Ground Ten, specifically, Respondents objected to the Magistrate Judge's finding that Petitioner made a sufficient showing to warrant additional evidentiary development regarding a juror's alleged contact with a minister. To further its review of Ground Ten, the District Court allowed Petitioner to submit an affidavit from the juror providing more detail as to the alleged contact. (ECF No. 81). Petitioner supplied an affidavit on December 19, 2014. (ECF No. 87). Based on that affidavit, filings by the parties, and the relevant case law, the Magistrate Judge then conducted an evidentiary hearing on January 29, 2015. (ECF No. 95). Following the hearing, counsel briefed the issue. (ECF Nos. 106, 107). On March 3, 2015, the Magistrate Judge issued a Supplemental Report and Recommendation (ECF No. 110), recommending summary judgment also be granted on Ground Ten. Petitioner timely objected to the Supplemental Report and Recommendation. (ECF No. 112).

On November 21, 2014, Petitioner mailed a second application for post-conviction relief ("PCR") to the Beaufort County Court of Common Pleas[1] and moved to stay these federal proceedings. (ECF No. 77). The motion to stay has been fully briefed and is ripe for the Court's review. (See ECF Nos. 83, 86, 88).[2]

## I.   Factual and Procedural Background

Petitioner was indicted in March 2002 for two counts of murder. The State timely served notice of intent to seek the death penalty and notice of evidence in aggravation pursuant to South Carolina Code §§ 16-3-20(B) and 16-3-26(A). Initially, Gerald Kelly and Sean Thornton of the

---

[1] Petitioner's application for PCR was filed on November 24, 2014. On December 17, 2014, the South Carolina Supreme Court assigned Judge R. Knox McMahon to maintain jurisdiction over and hear any matters regarding the application. See State v. Alkebulanyahh, No. 2014-CP-07-02994.
[2] See analysis at III.B, p. 8.

Beaufort County Public Defender's Office represented Petitioner. However, Petitioner moved to represent himself and the trial court granted his motion. Kelly and Thornton stayed on as standby counsel. Solicitor Randolph Murdaugh and Assistant Solicitors Duffy Stone and Angela Tanner – all of the Solicitor's Office for the Fourteenth Judicial Circuit – represented the State.

The Honorable Daniel F. Pieper, Circuit Court Judge, presided over the trial, which began on October 10, 2003. On October 20, 2003, the jury convicted Petitioner of two counts of murder, and on October 22, 2003, the jury recommended a sentence of death. Judge Pieper adopted the jury's recommendation.

Petitioner – then represented by Acting Chief Attorney Joseph L. Savitz, III, and Assistant Appellate Defender Robert M. Dudeck – timely filed a notice of appeal with the Supreme Court of South Carolina. On July 24, 2006, after considering full briefing and oral argument, the Supreme Court of South Carolina affirmed Petitioner's convictions and sentence. See State v. Roberts, 632 S.E.2d 871 (S.C. 2006). Petitioner, through counsel, filed a Petition for Rehearing, which the South Carolina Supreme Court denied on August 11, 2006. Remittitur issued the same day.

On November 9, 2006, Petitioner filed a Petition for Writ of Certiorari in the Supreme Court of the United States, which the Court denied by letter order on March 19, 2007.

On March 12, 2007, Petitioner filed a *pro se* PCR application. The Honorable Roger M. Young, Circuit Court Judge, was assigned to Petitioner's PCR action on May 4, 2007. Judge Young appointed Carl B. Grant and Glenn Walters to represent Petitioner on PCR. On February 8, 2008, PCR counsel filed an amended PCR application. On October 12-13, 2008, after the application was fully briefed, Judge Young held an evidentiary hearing. On December 17, 2008, the Supreme Court of South Carolina rescinded its order assigning Judge Young and transferred

the PCR action to the Honorable Carmen T. Mullen, Circuit Court Judge. Judge Mullen dismissed the PCR action with prejudice on September 7, 2009.

Thereafter, Petitioner – represented by John Blume[3] – timely appealed and filed a motion to remand the case for additional post-conviction proceedings. The South Carolina Supreme Court denied the motion on October 20, 2010. In response, Petitioner filed a Petition for Writ of Certiorari and a state habeas petition on February 18, 2011. The Supreme Court of South Carolina denied both petitions in one-sentence orders on February 22, 2013. Petitioner's state petitions for certiorari and habeas corpus raised the same grounds Petitioner raises in his federal habeas petition.

## II.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. At the summary judgment stage, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. Id. at 255. However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere

---

[3] John Blume, along with Emily Paavola and Lindsey Sterling Vann, also represents Petitioner in this matter.

allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e).

In addition, in accordance with the Antiterrorism and Effective Death Penalty Act ("AEDPA"), claims adjudicated on the merits in a state court proceeding cannot be a basis for federal habeas corpus relief unless the decision was "contrary to, or involved an unreasonable application of clearly established federal law as decided by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (2). When reviewing a state court's application of federal law, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  Williams v. Taylor, 529 U.S. 362, 411 (2000); see also Harrington v. Richter, 562 U.S. 86, 100 (2011). Accordingly, a federal habeas court must (1) determine what arguments or theories supported or could have supported the state court's decision; and then (2) ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of the United States Supreme Court. Richter, 562 U.S. at 102.

Further, under the AEDPA, a state court's decision "must be granted a deference and latitude that are not in operation" when the case is being considered on direct review. Id. at 785. Thus, state court factual determinations are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "If this standard is difficult to meet, that is because it was meant to be." Richter, 562 U.S. at 102. Section 2254(d) codifies the view that habeas corpus is a "'guard against extreme malfunctions

in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

## III. Discussion

In conducting this review, the Court applies the following standard:

> The magistrate judge makes only a recommendation to the Court, to which any party may file written objections . . . . The Court is not bound by the recommendation of the magistrate judge but, instead, retains responsibility for the final determination. The Court is required to make a de novo determination of those portions of the report or specified findings or recommendation as to which an objection is made. However, the Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the report and recommendation to which no objections are addressed. While the level of scrutiny entailed by the Court's review of the Report thus depends on whether or not objections have been filed, in either case the Court is free, after review, to accept, reject, or modify any of the magistrate judge's findings or recommendations.

Wallace v. Housing Auth. of the City of Columbia, 791 F. Supp. 137, 138 (D.S.C. 1992) (citations omitted).

In light of the standard set forth in Wallace, the Court has reviewed, de novo, the Report and Supplemental Report, the objections, and the record. The Report sets forth in detail the relevant facts and standards of law on this matter, and those facts and standards are incorporated by reference here. Below, the Court first considers the procedural posture of the case, followed by an analysis of Petitioner's claims.

### A. Exhaustion and Procedural Bar

The Report recommends dismissing the petition as procedurally barred because, while the Petitioner has *technically* exhausted his available state court remedies, he failed to *properly* exhaust them as to the claims he now raises in his federal petition. (ECF No. 75, pp. 17-21). Furthermore, his attempts to show cause and prejudice for this failure are unavailing, as

discussed by the Magistrate Judge. (See id. at 18-20). Petitioner objects to the Report's findings on several grounds. The Court has reviewed those objections and the relevant case law and agrees with the Report.

Petitioner argues that his case is virtually indistinguishable from Harrington v. Richter, 562 U.S. 86 (2011), where the United States Supreme Court found that the California Supreme Court's summary dismissal of a habeas petition constituted a merits dismissal. This Court disagrees. The Richter Court specifically stated that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits *in the absence of any indication or state-law procedural principles to the contrary*." 562 U.S. at 99 (emphasis added). Such state law procedural principals apply to Petitioner's case, distinguishing it from Richter. Specifically, in South Carolina, in the absence of extraordinary reason for the Court to exercise original jurisdiction stated in the filing(s) and supported by affidavits, the state supreme court will not entertain matters in its original jurisdiction where the matter can be entertained in the state trial courts. Rule 245 SCACR (renumbered from Rule 229 effective April 29, 2009); Simpson v. State, 329 S.C. 43 (1998); Key v. Currie, 305 S.C. 115, 116 (1991). Thus, as this Court has found, a state habeas petition filed in the South Carolina Supreme Court's original jurisdiction that does not provide the court with a well-supported extraordinary reason for the exercise of original jurisdiction "is an insufficient mechanism for review on the merits [to] properly present the issue to the state's highest court." McFarland v. Warden, Lieber Correctional Inst., C.A. No. 6:07-588-TLW-WMC, 2008 WL 697152, at *6 (D.S.C. March 11, 2008). The United States Supreme Court's ruling in Richter does not alter the existence or effect of this state-law procedural principle.

In this case, Petitioner's state habeas petition does not provide an extraordinary reason or supporting affidavits, nor does it reference Rule 245 or either of the primary cases discussing the rule. (See ECF No. 44-40). Thus, the state habeas petition did not comply with a state-law procedural principle and the Court does not presume that the South Carolina Supreme Court's summary dismissal of that petition was on the merits.

In addition, Petitioner asserts that his case should not be procedurally barred because this type of procedural bar is not based on independent state law grounds, nor is it consistently applied. However, Petitioner's argument assumes that the procedural bar derives from the state court's standard for granting a writ of habeas corpus, rather than from the procedural rule discussed above. Petitioner contends that, to grant or deny the writ, the state court must decide whether the petitioner has made a *prima facie* showing of the denial of a constitutional right, thus deciding a matter of federal law. Yet, if South Carolina Appellate Rule 245 applies, the state court would not reach this question.

Regarding consistency, Petitioner argues that the South Carolina Supreme Court has inconsistently resolved state habeas petitions filed in its original jurisdiction involving capital punishment. (See ECF No. 64 at 13-14). Petitioner does not, however, note whether the petitions filed in those cases complied with Rule 245, nor does Petitioner mention the rule in his brief discussion of this issue. Thus, the Petitioner has not made a showing that the state law rule is inconsistently followed.

Thus, for the reasons stated above and in the Report, the Court finds that all of Petitioner's claims are procedurally barred. However, for the sake of a thorough review in such an important matter, the Court has also analyzed the merits of Petitioner's claims.

8

**B.  Motion to Stay**

Under <u>Rhines v. Weber</u>, 544 U.S. 269 (2005), a district court has discretion to stay a mixed petition to allow a petitioner to present his unexhausted claims to the state court and then return to federal court for review of his perfected petition. However, because staying a petition "frustrates AEDPA's objective of encouraging finality" and "decreas[es] a petitioner's incentive to exhaust all his claims in state court prior to filing his federal petition," stay is only appropriate when: (1) "the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court"; (2) the petitioner's unexhausted claims are not plainly meritless; and (3) the petitioner demonstrates that he has not engaged in abusive litigation tactics or intentional delay. <u>Id.</u> at 277-79.

In his motion to stay, Petitioner asserts that, if the South Carolina Supreme Court did not adjudicate his claims on the merits, then his claims are not exhausted because, based on other recent cases, Petitioner may still have the opportunity to pursue his recently filed successive PCR application. To support his assertion, Petitioner points to five stayed capital habeas actions in this district—<u>Robertson v. Ozmint</u>, C/A No. 2:11-63-TMC-MGB; <u>Terry v. Byars</u>, C/A No. 4:12-1798-SB-TER; <u>Wood v. Byars</u>, C/A No. 0:12-3532-DCN-PJG; <u>Bryant v. Byars</u>, C/A No. 1:13-2665-BHH-SVH; and <u>Sigmon v. Byars</u>, C/A No. 8:13-1399-RBH-JDA. In each of these matters, the petitioner filed a successive PCR application in state court containing previously unexhausted claims. As well, in each case, the Court found good cause under <u>Rhines</u> to stay the matter and hold the petition in abeyance until the petitioner had an opportunity to exhaust all of his claims in state court.

However, in relying on these cases, Petitioner overlooks a critical distinction—each of the five stayed cases involves a mixed petition.[4]  In this case, for the reasons stated above and in the Report, all of Petitioner's claims are technically exhausted. Accordingly, <u>Rhines</u> does not apply here. Further, under these circumstances, staying this federal action would not comport with AEDPA's goal "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases." <u>Rhines</u>, 544 U.S. at 276 (internal citation omitted).

In addition, the Court agrees with the Report that Petitioner has failed to show good cause for or actual prejudice by the procedural default.     For these reasons, the Court DENIES Petitioner's Motion to Stay. (ECF No. 77).

### C.  Grounds One – Three

In Grounds One through Three, Petitioner raises procedural and substantive competency claims, including that the trial judge had an affirmative duty to inquire further into Petitioner's competency prior to the start of his capital sentencing proceeding (Ground One), that Petitioner was, in fact, incompetent throughout the guilt-or-innocence phase of his trial (Ground Two), and that the trial judge failed to secure a knowing, voluntary, and intelligent waiver of Petitioner's right to present mitigating evidence (Ground Three).

---

[4] <u>See</u> Petition, ECF No. 20 at 18-26, <u>Robertson v. Ozmint</u>, C/A No. 2:11-63-TMC-MGB (specifically identifying grounds V-XI as unexhausted claims and as pending in the petitioner's second PCR application); Petition, ECF No. 16 at 17-34, <u>Terry v. Byars</u>, C/A No. 4:12-1798-SB-TER (specifically identifying grounds II-V as unexhausted claims and as pending in the petitioner's second PCR application); Petition, ECF No. 85 at 14-40, <u>Wood v. Byars</u>, C/A No. 0:12-3532-DCN-PJG (stating that portions of grounds IV-VI had not been exhausted and that grounds VII-X were not exhausted – all of these claims were raised in a second PCR application filed the day before the federal habeas petition); Petition, ECF No. 14 at 15-18, 22-25, 27-29, <u>Bryant v. Byars</u>, C/A No. 1:13-2665-BHH-SVH (stating that grounds V, VI, VIII, IX, and XI were not exhausted – those claims were the subject of a second PCR application filed two days before the federal petition); Amended Petition, ECF No. 131 at 18-48, <u>Sigmon v. Byars</u>, C/A No. 8:13-1399-RBH-JDA (grounds VII-XI were the result of an independent <u>Martinez</u> investigation and had not been exhausted in state court – those claims were the subject of a second PCR application filed less than a month after the amended federal petition).

Regarding the Report's analysis of Petitioner's procedural competency claim, Petitioner objects to the Report's finding that the circumstances surrounding Petitioner's trial at no point raised a bona fide doubt as to Petitioner's competency. Petitioner asserts that the Report: (1) mischaracterizes his claim, (2) bases its findings on cherry-picked portions of the record and erroneous conclusions, and (3) improperly relies on Burket v. Angelone, 208 F.3d 172 (4th Cir. 2000), and Wise v. Bowersox, 136 F.3d 1197 (8th Cir. 1998).

In his objections, Petitioner states his assertion in Ground One as a claim that, "prior to the start of his capital sentencing proceeding, the totality of the circumstances raised a *bona fide* doubt about [Petitioner's] competency and triggered the trial court's affirmative duty to inquire further." (ECF No. 76, p. 15). Petitioner suggests that the Report misunderstood this claim, as evidenced by its conclusion that the trial court's initial finding of competency, after the Blair hearing and before the trial proceeded, was not unreasonable. However, after making this conclusion, the Report goes on to discuss verbal exchanges and events that took place during the trial and sentencing phase, and finds that the Supreme Court of South Carolina could have reasonably found that these circumstances did not create an affirmative duty for the trial court to inquire further into Petitioner's competency. Thus, the Court finds that the Report fully and correctly analyzed Petitioner's claim.

Petitioner also objects to the Report's findings on this ground as lacking explanation and relying on: "(1) [the Magistrate Judge's] effort to slice up the relevant evidence into narrow, rigid pieces; and, (2) his erroneous conclusion that all of Petitioner's actions were based on 'calculated, rational decisions.'" (ECF No. 76, p.15). According to Petitioner, the Report fails to address or even acknowledge relevant evidence of Petitioner's incompetency, including: (1) trial counsel's consistent position that Petitioner's competency was in question; (2) prior psychiatric

opinion evidence that Petitioner was incompetent; (3) Petitioner's behavior throughout the pre-trial and trial proceedings; (4) Petitioner's sudden decision to waive the twenty-four hour "cooling off" period; (5) Petitioner's refusal to participate in the sentencing phase; and (6) Petitioner's verbal disruption of the proceedings with a repeated religious chant. However, the Report explicitly mentions each of these pieces of evidence and bases its findings on all of them, "taken individually *or together*." (ECF No. 75, pp. 27-29 (emphasis added)).

Further, after conducting its own analysis of this claim, the Court agrees with the Report's findings and analysis. The issue over the Petitioner's competency claim "concerns the inferences that were to be drawn from the undisputed evidence and whether, in light of what was then known, the failure to make further inquiry into petitioner's competence to stand trial, denied him a fair trial." Drope v. Missouri, 420 U.S. 162, 174-75 (1975). To prevail on this type of procedural competency claim, Petitioner "must establish that the state trial court ignored facts raising a 'bona fide doubt' regarding the petitioner's competency to stand trial." Burket v. Angelone, 208 F.3d 172, 192 (4th Cir. 2000) (citing Pate v. Robinson, 383 U.S. 375, 384-86 (1966)). In analyzing this claim, "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant." Drope, 420 U.S. at 180.

The evidence relevant to Petitioner's competency and known to Judge Pieper between the guilt phase and sentencing phase and shortly after the beginning of the sentencing phase, when Petitioner asserts his competency was most in question, included: (1) the evidence presented at the Blair hearing, including the prior medical opinions of four expert witnesses; (2) Petitioner's behavior at that time, including his statements that he did not want to be present for the sentencing phase and did not want to present mitigating evidence, his attempt to waive the

cooling off period, his threats to disrupt the proceeding, and his actual outburst; and (3) Petitioner's demeanor up to that point.

At the <u>Blair</u> hearing, Judge Pieper heard from four experts. Dr. Schwartz-Watts, a defense expert in forensic psychiatry, met with Petitioner on three occasions, interviewed Petitioner's mother, and reviewed Petitioner's Department of Corrections records, school records, and some of his own writings. Based on her review, Dr. Schwartz-Watts diagnosed Petitioner with a bipolar disorder. (App. 3983, 5131). Dr. Schwartz-Watts also emphasized the fluid nature of competency and the need for continued monitoring. (App. 3988-89).

In her written report and at the hearing, Dr. Schwartz-Watts based her evaluation that Petitioner did not have present sufficient capacity to assist his attorney in his defense, in part, on Petitioner's paranoia and refusal to work with his defense team. She recognized that Petitioner had strong ideas about how his case should be presented and explained that her concern was not about the decisions Petitioner would make in representing himself, but the reasoning behind those decisions. (See App. 4000 ("I have no problem with Mr. Alkebulanyahh wanting to represent himself. I have no problem with Mr. Alkebulanyahh wanting to represent himself because he thinks he can do a better job than his attorneys. I have a problem with him wanting to represent himself when he thinks his attorneys are part of the Masons, they work with Mr. Murdaugh, they collude with Mr. Murdaugh to make sure that he doesn't get a fair trial so that he's persecuted because of his religious belief.")). She testified that Petitioner told her about some of the experts he wanted to present in the guilt phase and stated that some of them were "incredibly brilliant," that they were "pertinent," and "well thought of," (app. 4008), and that "[i]ntellectually . . . Mr. Alkebulanyahh has very good ideas about his case," (app. 4012). Dr. Schwartz-Watts's primary concern regarding Petitioner's ability to assist in his defense centered

on Petitioner's refusal to acknowledge his own mental illness. Dr. Schwartz-Watts expressed her concern that this refusal prevented him from effectively weighing available options for a defense, which could become an issue should the trial proceed to the sentencing phase. (App. 3987 ("he would not even consider in any way, shape, or form any forms of mitigation that have to do with possible mental illness . . . he won't even consider those kinds of issues and to me that's what renders him unable to assist himself"); App. 4008-09 ("the concern I have is that if you go to the area of capacity where he has to weigh options, weigh defenses that are available to him, specifically in the sentencing phase if this trial were to proceed to that point, it's my opinion his mental illness prevents him from even exploring those options")).

Because Petitioner refused to meet with her the morning of the hearing, Dr. Schwartz-Watts would not testify as to a definite opinion regarding Petitioner's competency. (App. 3990). However, in her written evaluation, Dr. Schwartz-Watts stated her opinion that Petitioner did "not have present sufficient capacity to assist his attorney in his defense due to his mental illness." (App. 5132).

Dr. McKee, a defense forensic psychology expert, did not meet with Petitioner. Rather, his opinions were based on his review of the tests conducted by the State's experts. (App. 4019-20). Dr. McKee testified that Petitioner's elevated score on one scale made him question the validity of a diagnosis associated with that test, (app. 4022), and testified to the fluid nature of competency, (app. 4023). However, Dr. McKee offered no opinion regarding Petitioner's ability to assist in his own defense or represent himself. (App. 4025).

Dr. Frierson, the State's psychiatry expert, met with Petitioner four times. Based on his evaluation and interviews, Dr. Frierson diagnosed Petitioner with a personality disorder with narcissistic and antisocial traits, which Dr. Frierson stated is "not considered a major mental

14

illness" and would not prevent Petitioner from conforming his actions to the law. (App. 4031). Dr. Frierson addressed Dr. McKee's concerns about Petitioner's elevated test scores, (app. 4031-32), and expressed his opinion that Petitioner did not suffer from paranoid delusions (app. 4034-36). Ultimately, Dr. Frierson opined that Petitioner had "a factual understanding of the legal system, a rational understanding of court process and the capacity to assist an attorney in the preparation of a defense." (App. 4030).

Finally, Dr. Musick, a State expert in forensic psychology, who was involved in the same interviews and evaluations as Dr. Frierson, also opined that Petitioner was capable of representing himself or aiding and assisting counsel at trial. (App. 4044). This opinion was based, in part, on Petitioner's ability to correctly answer questions about how the court works, the roles of the people involved in the legal process, appropriate behavior in the courtroom, what he was charged with, and what the possible penalties were. (App. 4044-45).

Regarding Petitioner's behavior throughout the guilt phase of the trial, the record does not reveal a basis for relief. The record reflects that Petitioner worked with his standby counsel and Judge Pieper stated on the record that he "handle[d] all the proceedings fairly well." (App. 3541). After the jury returned the guilty verdict, Petitioner consulted with his standby counsel and made appropriate post-trial motions. (App. 3480). And, just before the sentencing phase, Petitioner took up the issue of preparing transcripts for his appeal. (App. 3543).

In addition, Petitioner's decisions regarding the sentencing phase were consistent with Petitioner's stated intentions and were not without reason. While the Petitioner could have pursued different options, the issue is whether he was competent to make the decisions he chose to make, which are relevant to his competency to represent himself. The Petitioner's consistency and ability to follow through with his intentions is illustrated by his consistent decisions not to

offer mitigation evidence. (App. 3491 ("I told my investigators . . . adamantly that there will be no mitigating witnesses for me in reference to anything if it came down to this point."); App. 3495 (after counsel confers with Petitioner, standby counsel states that Petitioner "reaffirms his decision to stop all mitigation preparation as of August 1 when he was appointed counsel of record"); App. 3515 (regarding mitigation evidence, standby counsel states that "[s]ince [Petitioner] took over the case, he didn't wish - - stated repeatedly that he did not want that done, and that's been shut down")).

Judge Pieper questioned Petitioner's reasoning:

The Court: Is there a reason that you are now after this point indicating that you're not going to comply with the court's instructions and the procedures of this court?

Mr. Alkebulanyahh: Yes.

The Court: What is that?

Mr. Alkebulanyahh: Because I - - at this - - there is nothing that - - it has nothing to do with me. It has nothing that - - you know, I'm not concerned about it. I don't care about it. It has nothing to do with me. It don't - - it won't move me or shake me no matter which way it goes, one way or the other. What is said or done, so.

The Court: Well, this proceeding is all about you.

Mr. Alkebulanyahh: well - - -

The Court: Well, it's an opportunity - - -

Mr. Alkebulanyahh: - - - It has nothing to do - - -

The Court: - - - If you desire to let the jury know about you.

Mr. Alkebulanyahh: I don't want the jury to know nothing about me. They don't know nothing about me. I'm not concerned about a jury. I'm not concerned about their verdict. I'm not concerned whether they're going to say death, you know, or life sentence. That has no relevance in my mind.

> The Court: But do you understand you have a right to present to them information about yourself?
>
> Mr. Alkebulanyahh: I have presented all that I want to present. I understand that from the beginning before we even got to this point. Everything I have want to present, exercise the right. I have done that. No disrespect toward the court or anyone else.

(App. 3486-87). Again, while Petitioner's reasoning may not be conventional or wise, the record reflects it is thought out and rational. Furthermore, the Court notes that Petitioner's actions and decisions were consistent with his decision early on not to present mitigating evidence and his desire to waive the twenty-four hour cooling off period—Petitioner made the decision that he presented all he wanted to present during the guilt phase.

Furthermore, Petitioner's disruptive behavior[5] reflects his professed desire to be absent from the relevant sentencing proceedings. On the record, the outbursts appear to be a calculated, non-violent means of disrupting proceedings and testimony he did not wish to witness.

In addition, Petitioner's exchanges with Judge Pieper regarding his decisions and his plans to disrupt the sentencing proceedings if forced to attend are clear and goal-oriented and do not demonstrate any lack of understanding of court processes or the upcoming proceeding.

The record shows that Petitioner's behavior raised issues that Judge Pieper addressed in detail with him:

> The Court:  Mr. Alkebulanyahh, I have a few more things I just wanted to make sure that I had straight in my mind, just for purposes of the record, because pretty much I've been trying to honor your requests throughout. Some time ago when I went through with you all the - - went through with you the advantages and disadvantages of representing yourself. I can't remember if we were in Florence or Charleston. And you indicated to me that you understood all those things at the time when I made the decision to allow you to represent yourself; is that correct?

---

[5] During sentencing, as soon as the first witness began to respond to questions, Petitioner stood up and stated, "Blessed be Yahweh, El Shaddai, Jehovah, God Almighty, the God of Abraham, Isaac, Ishmael, Jacob, and Jesus." (App. 3550-51).

Mr. Alkebulanyahh: That's correct.

The Court: Now, and I also advised you that I did not think that was a wise thing to do. But you have a constitutional right to do so.

At the time I told you - - if I recall correctly - - that even though I was granting your request to waive the assistance of counsel and allow yourself to represent yourself, that if for some reason you changed your mind, to let me know during the sentencing phase of the case.

And if my recollection is correct, you indicated that you would think about that.

I'm sure we've been over this before. But I need to make sure for the record that you understood everything I indicated about the advantages and disadvantages - - that would all apply equally to this phase of the trial.

I mean, the solicitor may try to present evidence that may not be admissible, I don't know. There may be certain evidence that you don't know to present that your attorneys could advise you about, witness information, there may be certain evidentiary matters that you're not aware of. There may be certain rulings that need legal argument or legal argument could affect those rulings that you would not know to make. And, especially in the sentencing phase of the trial, when you can have such a severe impact because they're talking about life and death.

Do you remember when we went over those advantages and disadvantages?

Mr. Alkebulanyahh: Yes, sir. I think I recall.

The Court: Now, everything you have told me is that you do not want counsel to represent you in any way whatsoever; is that correct?

Mr. Alkebulanyahh: Yes.

The Court: Now, just so I know to satisfy myself, you waive counsel as to this phase also?

Mr. Alkebulanyahh: Yes, sir.

The Court: And you do remember everything that I've indicated about how that could be very detrimental to you?

Mr. Alkebulanyahh: Yes, sir.

The Court: And I can't emphasize enough that I would not do that, that we are talking about a life or death sentence. And, actually, not just life or death. Theoretically, if a jury were successfully convinced that there were no aggravating circumstances or they did not return a finding that there are

any aggravating circumstances, the possibility of a 30 year sentence is available. Do you understand that?

Mr. Alkebulanyahh: Yes, sir.

The Court: And knowing all these things that we've previous - - I think we've been over those Foretta (phonetic) factors or the advantages and disadvantages in two separate hearings, knowing all that, do you still wish to proceed without counsel?

Mr. Alkebulanyahh: Yes, sir.

The Court: Are you sure?

Mr. Alkebulanyahh: Yes, sir.

The Court: All right. As I indicated before in the prior proceedings, that I don't think it's a wise decision, but the defendant has that constitutional right notwithstanding the verdicts in the first phase of the trial. The defendant did handle all the proceedings fairly well. And I don't see a reason to change my decision at this point, although the defendant has indicated to me that this part of the trial is not something he wants to engage in.

   I think the defendant has the constitutional right to make a decision when he does not wish to present certain information or no information at all, even though that may not be a wise decision.

(App. 3538-41). The circumstances warranted the significant and focused attention Judge Pieper afforded them. Judge Pieper carefully considered the self-representation question at trial. The Court agrees with the conclusion of fact in the Report that the state court could have reasonably found that Judge Pieper was not constitutionally required to further inquire into Petitioner's competency, after having done so, during a later stage in the trial. The preceding portion of the record reflects that Judge Pieper was discussing and evaluating Petitioner's position and concomitant competency during the exchange. There was sufficient, timely, and continuing review of Petitioner's desire to represent himself.

In addition, Petitioner objects to the Report's reliance on <u>Burket v. Angelone</u>, 208 F.3d 172 (4th Cir. 2000), and <u>Wise v. Bowersox</u>, 136 F.3d 1197 (8th Cir. 1998).[6] The Court has carefully reviewed the Report's application of these two cases to the facts of this case and finds no error. While both cases are factually distinguishable from this case, the Report relies on them, not for their factual similarities, but for their recitations of the standards applicable to procedural and substantive competency claims and their analytical frameworks. The Report's reliance on <u>Burket</u> is especially appropriate as <u>Burket</u> is one of this Circuit's most recent cases addressing procedural and substantive competency claims in a capital habeas matter and, thus, guides this Court's analysis of those issues.

Regarding the Report's analysis of Ground Two, Petitioner's substantive competency claim, Petitioner objects to the Report's findings that (1) the record contains contradictory evidence regarding Petitioner's claim that he was incompetent-in-fact during the sentencing phase and subsequent appeals and (2) the record is replete with evidence of Petitioner's competency.[7] The Court has thoroughly reviewed the record and accepts the Report's analysis and recommendation on this ground. (<u>See</u> ECF No. 75, p. 29).

A petitioner raising a substantive competency claim must demonstrate his incompetency by a preponderance of the evidence. <u>Burket</u>, 208 F.3d at 192. "Not every manifestation of mental

---

[6] Petitioner specifically objects to the "dispositive weight" the Report places on <u>Wise</u>. (<u>See</u> Objections, ECF No. 76, p.16). The Report cites to <u>Wise</u> one time, stating: "While the undersigned would not promote Petitioner's decisions as sound trial strategy, 'bad trial tactics do not prove a defendant incompetent.'" (Report, ECF No. 75, p. 28 (quoting <u>Wise</u>, 136 F.3d at 1204)). The Court does not read this section of the Report as turning on the Eighth Circuit's decision in <u>Wise</u>. Rather, the Report uses another court's language to express a widely-held sentiment associated with the right to <i>pro se</i> representation—a defendant may conduct his own defense to his detriment. <u>See, e.g.</u>, <u>Faretta v. California</u>, 422 U.S. 806, 834 (1975).

[7] Petitioner also objects to the Report's recitation of the facts relevant to Grounds One through Three as a regurgitation of Respondents' version of the facts, adopted by the PCR court in its order. Petitioner asserts that, "[t]o date, no court – not the PCR court, nor the South Carolina Supreme Court, nor the Magistrate Judge – has engaged in an objective assessment of the record and reached conclusions based on the exercise of sound, independent judgment." (ECF No. 76, p. 14). The Court acknowledges this objection, but does not find it persuasive. After conducting its own thorough, independent review of the record, the Court agrees with the facts as stated in the Report.

illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." United States ex rel. Foster v. DeRobertis, 741 F.2d 1007, 1012 (7th Cir. 1984). "Likewise, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." Burket, 208 F.3d at 192.

As discussed above and in the Report, Petitioner has failed to meet this standard. Petitioner's behavior and decisions were rationally made by a rationally thinking defendant. The record reflects this conclusion, by a preponderance of the evidence, and does not amount to a showing of incompetence or even clear decompensation. Further, the record shows that both Judge Pieper and Petitioner's standby counsel remained cognizant of Petitioner's mental status throughout the trial and the sentencing phase. On this record, the Court cannot find or conclude that Petitioner is entitled to relief on Ground Two.

In Ground Three, Petitioner asserts that the trial judge failed to secure a knowing, voluntary, and intelligent waiver of Petitioner's right to present mitigating evidence. The Report finds that, based on Schriro v. Landrigan, 550 U.S. 465, 479 (2007), this claim lacks merit. (ECF No. 75, p. 30). Petitioner does not object to the Report's analysis of this ground and the Court agrees with the Report's finding.

### D.  Ground Four

In Ground Four, Petitioner asserts that the trial judge erred by failing to terminate Petitioner's *pro se* status after Petitioner's disruptive behavior and unwillingness to participate in the penalty phase of his trial. Petitioner objects to all of the Report's findings regarding this ground, but specifically points to the Report's conclusion that no constitutional error occurred because "[b]y removing Petitioner from the courtroom, but placing him in an area where he

could see and hear the proceedings and communicate with his standby counsel, the trial judge allowed Petitioner to maintain control of his own defense while also discontinuing disruptions." (See Report, ECF No. 75, pp. 32-33). Petitioner objects to this statement as "offer[ing] no explanation for how or why the trial judge's decision comports with the requirements of the Constitution." (ECF No. 76, p. 20).

A criminal defendant has a Sixth Amendment right to self-representation. See Faretta v. California, 422 U.S. 806, 809 (1975). However, that right is not absolute and a trial court may "terminate self-representation or appoint 'standby counsel'—even over the defendant's objection—if necessary." Martinez v. Court of Appeal of California, 528 U.S. 152, 161-62 (2000). Thus, state trial courts may limit a defendant's right to self-representation when "the government's interest in ensuring the integrity and efficiency of the trial . . . outweighs the defendant's interest in acting as his own lawyer," id., such as when the court is "confronted with disruptive, contumacious, stubbornly defiant defendants," Illinois v. Allen, 397 U.S. 337, 343 (1970).

Petitioner asserts that, under this standard, Petitioner's outbursts and unwillingness to participate in the penalty phase of his trial provided the trial court with reason and justification to revoke his pro se status and that, by not revoking Petitioner's pro se status and appointing standby counsel, the trial court failed to ensure the integrity of the adversarial process.

In this case, the trial court faced a number of decisions based on the conduct and request of Petitioner. Judge Pieper had to consider Petitioner's right to self-representation, the requirement that capital defendants attend their trials, Petitioner's right to choose not to present mitigation evidence or testify during the sentencing phase, the integrity of the trial, and standby counsel's own ethical concerns regarding their duty to their client and complying with the rules

of professional responsibility. The record shows that Judge Pieper understood the significance of his decision to allow Petitioner to continue to proceed *pro se* and gave it abundant consideration. The record reflects he did not take or make that decision lightly.[8]

After Petitioner informed the judge that he would be unruly if required to attend his sentencing proceedings, the judge recognized that he was in a "peculiar position." (App. 3487). Judge Pieper consulted with counsel for the State and Petitioner's standby counsel and began to prepare for the possibility of appointing standby counsel. (App. 3487-90). He adjourned court so that he and counsel could research the issue and standby counsel could further consult with Petitioner about his decision. (App. 3490-3511). Judge Pieper specifically considered whether Petitioner's statements that he did not intend to participate in the sentencing phase were an effective withdrawal of his motion to represent himself so that he could appoint counsel. (App. 3509-10). After much discussion and significant review,[9] Judge Pieper decided that the proper course would be to wait and see if Petitioner did in fact disrupt the proceedings before considering officially appointing standby counsel as counsel of record and depriving Petitioner of his right to self-representation.

In making that decision, the judge recognized that "the dilemma would be in the event that [Petitioner] is removed" from the courtroom. (App. 3513). As a result, much of Judge Pieper's exhaustive discussion with counsel revolved around how to handle that situation, should it arise. After Petitioner's second outburst, when it became necessary to act on those discussions,

---

[8] See, e.g., App. 3507 (Judge Pieper recognized that "society has a strong and compelling interest in a full and fair capital sentencing proceeding," but also that "you have to be very careful about trumping the right to represent" yourself); App. 3524 ("See, we've been reading about 20 different cases . . . and it kind of goes different ways"); App. 3529 (Judge Pieper remarks that "[t]his is definitely not an easy decision").

[9] Judge Pieper's discussions with the attorneys and deliberations on this issue constitute over fifty pages of the record. (See App. 3487-3543). The judge researched the relevant issues, the attorneys for the State and Petitioner's standby counsel researched the issues and presented their findings and opinions to the judge, Petitioner voiced his own opinions and concerns, and counsel for the State even contacted the Attorney General's office and requested additional review. (App. 3533).

Judge Pieper placed Petitioner in a room at the back of the courtroom where he could hear and see all of the proceedings. (App. 3556). Thus, Petitioner was not removed from the courtroom. Notably, Petitioner and the judge authorized standby counsel, who remained at the counsel table, to interject objections, handle the exhibits, and make the closing statement if necessary. (App. 3556-57). The record reflects that, once placed in the back room, Petitioner did not disrupt the court in any way and the proceedings continued. Again, standby counsel remained in place.

After a thorough review of the record and relevant legal standards, the Court finds that, in this case, Judge Pieper was not constitutionally obligated to revoke Petitioner's *pro se* status. As noted in the Report, while trial courts have the authority to revoke a defendant's *pro se* status when he disrupts the trial proceedings, they are not constitutionally required to do so. See Davis v. Grant, 532 F.3d 132, 149 (2d Cir. 2008) (finding state court's failure to appoint standby counsel when defendant removed from courtroom not objectively unreasonable application of Supreme Court precedent); Clark v. Perez, 510 F.3d 382, 395-96 (2d Cir. 2008) (no Sixth Amendment violation where court did not revoke *pro se* status of defendant removed from courtroom because of conduct). Rather, the Supreme Court has recognized that "[n]o one formula for maintaining the appropriate courtroom atmosphere will be best in all situations," and, thus, "[t]rial judges . . . must be given sufficient discretion to meet the circumstances of each case." Allen, 397 U.S. at 343.

In his objections, Petitioner also points to an asserted discrepancy in the Report's findings that Judge Pieper maintained the adversarial process by instructing standby counsel to object where necessary and that standby counsel is not subject to Petitioner's ineffective assistance of counsel claims. (ECF No. 76, p. 20). This Court finds no basis for relief. "Although a criminal defendant has both a right to counsel and a right to represent himself, those rights are 'mutually

exclusive.'" United States v. Beckton, 740 F.3d 303, 307 (4th Cir. 2014) (quoting United States v. Singleton, 107 F.3d 1091, 1100 (4th Cir. 1997)). Thus, if a criminal defendant chooses to represent himself, he has no right to standby counsel. See McKaskle v. Wiggins, 465 U.S. 168, 183 (1984) (rejecting a Sixth Amendment guaranteed right to "hybrid" representation); Singleton, 107 F.3d at 1100. And a trial court, "in keeping with its broad supervisory powers, has equally broad discretion to guide what, if any, assistance standby, or advisory, counsel may provide to a defendant conducting his own defense." United States v. Lawrence, 161 F.3d 250, 253 (4th Cir. 1998). Further, "[p]articipation by counsel with a *pro se* defendant's express approval is, of course, constitutionally unobjectionable." McKaskle, 465 U.S. at 182.

Thus, standby counsel may assume a limited role in the trial proceedings without infringing upon a defendant's right to represent himself. See id. at 184 ("A defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel – even over the defendant's objection – to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals."). As long as the defendant continues to represent himself, he has no right to any relief if standby counsel is appointed. And, because he has no right to standby counsel, counsel's assistance cannot be constitutionally ineffective.[10]

Here, Petitioner expressly consented to allow standby counsel to assume a limited role during the sentencing phase while also reaffirming his desire to continue to represent himself. Notably, standby counsel acted in accordance with Petitioner's desires and the trial court's instructions. Those actions did not infringe on Petitioner's Sixth Amendment rights so as to

_____

[10] More discussion on Petitioner's ineffective assistance of counsel claims continues in the Court's analysis of Grounds Six through Eight below, which relate to the penalty phase and closing argument.

effectively withdraw his waiver of counsel. The trial court was not required to revoke Petitioner's *pro se* status. Again, there is no basis for relief on this claim.

Accordingly, the Court cannot find that the state court's dismissal of this claim would have been an objectively unreasonable application of clearly established Supreme Court precedent.

### E. Ground Five

In Ground Five, Petitioner asserts that his death sentence violates the Fifth, Eighth, and Fourteenth Amendments because he was visibly shackled without justification and without an individualized determination by the trial judge. Petitioner objects to the Report's finding that summary judgment is appropriate on this ground because the South Carolina Supreme Court expressly found that Petitioner's restraints were not visible to the jury.

The Supreme Court has made clear that "the Constitution forbids the use of visible shackles during the penalty phase" of a capital trial, "*unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." Deck v. Missouri, 544 U.S. 622, 624 (2005) (emphasis in original) (citing Holbrook v. Flynn, 475 U.S. 560, 568-69 (1986)). This rule is meant to combat the prejudicial effect visible restraints could have on a jury, see id. at 632, and, thus, does not apply in the same determinative way when a jury is unaware of the restraints.

In its order denying Petitioner's direct appeal, the Supreme Court of South Carolina stated in its recitation of the facts that Petitioner "was placed in a conference room at the back of the courtroom which had a glass partition to allow him to hear and see into the courtroom. He was initially restrained, but the restraints were removed before the jury was returned to the courtroom."  (Order, State v. Roberts, 632 S.E.2d 871, 873 (S.C. 2006), ECF No. 44-15 at 4).

Based on the state court's account of the facts, the Report recommends granting summary judgment on this claim. Petitioner objects, asserting that the state court's account is not an express finding that the restraints were not visible to the jury. In support, Petitioner argues that the South Carolina Supreme Court was not considering a shackling claim and that the record does not show clearly that the jurors did not see the restraints. According to Petitioner, the lack of record evidence is typical of this type of claim and the Court should hold an evidentiary hearing to give Petitioner an opportunity to prove his allegations.

The Court disagrees. Under the AEDPA, a state court's decision "must be granted a deference and latitude that are not in operation" when the case is being considered on direct review. Harrington, 131 S. Ct. at 785. Accordingly, state court factual determinations are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Thus, the South Carolina Supreme Court's recitation of the facts is entitled to deference. While the state court was not considering the shackling claim currently before this Court, the state court's order makes a clear finding that Petitioner's shackles were not visible to the jury. This fact entitles Petitioner to no relief on this claim. For this Court to find otherwise would require it to disregard the applicable standard of review and essentially find that the South Carolina Supreme Court's order included an erroneous factual determination.

After a full review of the record and Petitioner's submissions, the Court finds no reason to deviate from the Report's recommendation. According to the record, after Petitioner's second outburst, at 11:55 a.m., the jury left the courtroom. (App. 3556). At that point, the judge moved Petitioner to the room at the back of the courtroom. (App. 3560). Then, an officer asked the judge if Petitioner was to "remain unrestrained" while in the back room. (App. 3561). The judge

replied that Petitioner should be restrained but agreed to leave Petitioner's hands unrestrained so he could cover his ears if he wanted. (App. 3561-63). Again, the evidence supports the state court's conclusion that the restraint was not visible to the jury.

The jury did not return to the courtroom until 12:20 p.m., when Petitioner was in the back room and all other court personnel were back in place. (App. 3563-65). The judge then gave the jury a curative instruction regarding the outburst and Petitioner's absence from the defense table, and the State proceeded to present several of its witnesses. At 1:00 p.m., the jury exited for lunch and the judge cleared the courtroom before taking up matters with the attorneys. (App. 3594-95). After speaking briefly with the attorneys, the judge cleared everyone else from the courtroom and then instructed an officer to move Petitioner for lunch. (App. 3595-96).

During the lunch recess, Petitioner indicated to the judge that he wished to remain in the back room, but without the restraints, and that he would not be disruptive. (App. 3596). The judge agreed to remove the restraints and instructed an officer to take off the restraints once Petitioner was in the back room in the courtroom. (App. 3597). Petitioner returned to the back room, the judge ensured that Petitioner could hear and see the front of the courtroom, and, after the judge let everyone else back into the courtroom, the jury returned at 2:14 p.m. (App. 3597-98). Thus, the record reflects that the jury never saw Petitioner in shackles.

To support his claim, Petitioner has provided the court with the affidavit of Kara Noel, a law student who, along with three other students, interviewed eight of the jurors from Petitioner's case. In that affidavit, Ms. Noel states that "[o]ne or more jurors recalled Mr. Roberts being removed from the courtroom during sentencing and that Mr. Roberts was shackled 'right at the desk' and then taken to the back room where he remained in shackles." (ECF No. 31-2, p. 2).

The Court has considered this affidavit and finds that it does not constitute clear and convincing evidence to overcome the state court's finding and the record. Further, even if the Court assumes the affidavit accurately recalls the facts of Petitioner's shackling, Petitioner has still failed to show a constitutional violation. Under Deck, a court may not use visible shackles during the penalty phase of a capital case, "*unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." 544 U.S. at 624 (quoting Holbrook, 475 U.S. at 568-69). Here, the record shows that Petitioner clearly undermined courtroom decorum and order. While Judge Pieper did not make specific formal findings on the record regarding shackling Petitioner, the record supports any finding that Judge Pieper's decision to shackle Petitioner comported with the Constitution.

For these reasons and those stated in the Report, the Court cannot find that the state court's dismissal of this claim would have been an objectively unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of the facts.

### F.  Grounds Six – Eight

In Grounds Six through Eight of his Petition, Petitioner argues that his standby counsel were ineffective for failing to object to (1) prison condition evidence presented during the penalty phase of the trial (Ground Six); (2) the "extensive amount of victim impact evidence" introduced during the penalty phase (Ground Seven); and (3) inflammatory and improper statements made during the prosecution's closing arguments, which statements rendered the sentencing phase fundamentally unfair (Ground Eight). (ECF No. 31, pp. 36-49). The Report found that Petitioner had no right to effective assistance, and that even if he did, his standby

counsel's activity did not rise to the level of ineffective assistance. Because each of these claims involves ineffective assistance of counsel, they are addressed here together.

Petitioner specifically objects to the Report's findings regarding Grounds Six, Seven, and Eight. His first objection goes to all three grounds: he argues that his right to effective assistance of counsel was triggered when the trial judge terminated Petitioner's *pro se* status and assigned representation, in full, to Petitioner's stand-by counsel. Petitioner also individually objects to the Report's findings regarding Grounds Six and Eight, as more fully discussed below. As noted above, Ground Six alleges that trial counsel failed to object to evidence of prison conditions, and Ground Eight alleges that trial counsel failed to object to statements made by the Prosecutor in closing arguments. For the reasons described below, the Court finds that Petitioner's right to effective assistance of trial counsel was never triggered at trial, and so his claims of ineffective assistance must fail.

As previously discussed,[11] the Constitution permits a defendant to waive his constitutional right to counsel and choose to represent himself during criminal proceedings, provided the defendant waived his rights willingly and intelligently. See Faretta v. California, 422 U.S. 806, 835-36 (1975). Other circuits have found that once a defendant waives the right to representation, he is responsible for his own defense, and even if standby counsel is appointed to assist, there is no right to effective assistance of standby counsel. See, e.g., United States v. Morrison, 153 F.3d 34, 55 (2d Cir. 1998) (noting that "without a constitutional right to standby counsel, a defendant is not entitled to relief for the ineffectiveness of standby counsel"). See also United States v. Windsor, 981 F.2d 943, 947 (7th Cir. 1992) (stating that it "knows of no constitutional right to effective assistance of standby counsel"). Both the Second and Seventh Circuits contemplated that standby counsel may, in limited circumstances, begin functioning as

---

[11] See supra p. 22.

Sixth Amendment counsel; however, this occurs only when the defendant no longer controls his own defense or can no longer represent himself. See Morrison, 153 F.3d at 55; Windsor, 981 F.2d at 947. In such a case, standby counsel ceases to serve in a standby capacity and becomes counsel of record. See Morrison, 153 F.3d at 55; Windsor, 981 F.2d at 947.

It is reasonable to conclude that the Fourth Circuit would follow the reasoning of the Second and Seventh Circuits in finding that there is no right to effective assistance of standby counsel. Like the Second and Seventh Circuits, the Fourth Circuit has held that "a pro se defendant has no right to standby counsel when he chooses to proceed pro se." United States v. Beckton, 740 F.3d 303, 307 (4th Cir. 2014). Furthermore, in United States v. Singleton, 107 F.3d 1091, 1101 (4th Cir. 1997), the Fourth Circuit found, implied in the Faretta decision, that an assertion of the right to self-representation amounts to a "waiver of the right to 'effective assistance'...." This line of reasoning is nearly identical that used in the Second and Seventh Circuits to conclude that a defendant who waives his right to self-representation has no right to the effective assistance of standby counsel. Thus, it follows that without a constitutional right to standby counsel, a defendant is not entitled to relief for the ineffectiveness of standby counsel.

The questions in this case, therefore, are (1) whether Petitioner asserted his right to self-representation, thereby waiving his right to effective assistance of standby counsel, and (2) if so, whether Petitioner's *pro se* status was ever revoked so that standby counsel began functioning as Sixth Amendment counsel. Petitioner does not dispute that he asserted his right to represent himself. Thus, in answer to the first question, Petitioner asserted his right to self-representation and waived his right to effective assistance of standby counsel.

The answer to the second question, however, is disputed. Petitioner argues that his *pro se* status was revoked when "the trial judge – with Petitioner's consent – ordered standby counsel to

31

make objections and a closing argument." (ECF No. 76, p. 22). This position has no merit. The record clearly reflects that Petitioner's *pro se* status was *not* revoked.[12] For example, immediately prior to the sentencing phase, the trial judge re-evaluated Petitioner's competency to proceed *pro se* and saw no reason to change his decision regarding Petitioner's *pro se* representation. (App. 3541). Specifically, he noted that Petitioner had handled the prior proceedings "fairly well." (Id.). Moreover, the trial judge's comments to counsel indicate that while standby counsel were permitted to assist, their assistance was limited to actions specified by Petitioner. (Id. at 3541-42). Thus, Petitioner was still in control of his case and of standby counsel's involvement. Had the trial judge intended to terminate the Defendant's right to self-representation, it would be inconsistent to then limit standby counsel's involvement in this manner. Thus, the record clearly indicates that the trial judge did not terminate Petitioner's *pro se* representation. Therefore, Petitioner had no right to effective assistance of counsel.

In summary, having reviewed the relevant case law and the record, the Court finds that the state court's decision on this matter was neither an unreasonable application of – nor contrary to – established federal law, nor did it involve an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. Thus, the Report's findings as to Grounds Six, Seven, and Eight are accepted.

## G. Ground Nine

In Ground Nine, Petitioner asserts that the prosecution exercised its peremptory challenges in a racially discriminatory manner in violation of Petitioner's Sixth and Fourteenth Amendment rights. Specifically, Petitioner argues that the State improperly struck four of five

---

[12] See discussion supra Part III.D.

potential African-American[13] jurors: Edith Owens, Matthew Young, Antwoine Crosson, and Kerry Brown. (ECF No. 31, p. 49). The state trial court held a <u>Batson</u>[14] hearing on this issue following jury selection; however, the trial judge found no basis for relief. In the Report, the Magistrate Judge recommends that the trial court's decision be upheld.

Petitioner specifically objects to the Report's "failure to address Petitioner's evidence and argument that the reasons provided by the State for striking four African-American jurors were pretextual." (ECF No. 76, p. 32). Petitioner then discusses each of these four jurors individually and asserts – primarily based on comparative juror analysis – that the Prosecutor's strikes were racially motivated. (<u>Id.</u> at 32-45). In conducting this analysis, Petitioner offers new arguments and juror comparisons that he did not make at trial. As an initial matter, the Court finds that these new arguments and comparisons were not preserved for review. However, even assuming that these new arguments and comparisons are properly before this Court,[15] the Court finds no clear error in the state court's decision and no basis for relief now. This Court will further discuss the <u>Batson</u> issue below.

### a. Procedural Bar

Procedural bypass applies when a petitioner failed to raise a claim at the appropriate time in state court and has no further means of bringing that issue before the state courts. If this occurs, the person is procedurally barred from raising the issue in his federal habeas petition. The United States Supreme Court has clearly stated that the procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by the federal courts. <u>Smith v. Murray</u>,

---

[13] The Court notes for the record that one of the victims in this case – Lance Cpl. Dana Lyle Tate – was African-American.

[14] <u>See</u> <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

[15] In their motion for summary judgment, the Respondents argued that these additional arguments were not preserved for appellate review. (ECF No. 43, p. 76). The Report did not address this issue and instead addressed Petitioner's additional arguments on the merits. This Court has reviewed the preservation issue and the arguments on the merits.

477 U.S. 527, 533 (1986). In South Carolina, a defendant's failure to raise an objection at trial constitutes a procedural default of his claim. State v. Grovenstein, 530 S.E.2d 406, 413 (S.C. 2000); State v. Pauling, 470 S.E.2d 106, 109 (S.C. 1996) ("Having denied the trial judge an opportunity to cure any alleged error by failing to contemporaneously object…, Appellant is procedurally barred from raising these issues for the first time on appeal."); State v. Burton, 486 S.E.2d 762, 764 (S.C. Ct. App. 1997); see also Jackson v. Speed, 486 S.E.2d 750, 761 (S.C. 1997). Further, if procedurally defaulted, federal habeas review of this claim is barred unless Petitioner can demonstrate cause and prejudice, or actual innocence. Coleman v. Thompson, 501 U.S. 722 (1991); Wainwright v. Sykes, 433 U.S. 72 (1977); Waye v. Murray, 884 F.2d 765, 766 (4th Cir. 1989), cert. denied, 492 U.S. 936 (1989). Petitioner has not asserted any specific cause for a procedural default as to this claim, nor has he alleged actual innocence. See 28 U.S.C. § 2254; Rodriguez v. Young, 906 F.2d 1153, 1159 (7th Cir. 1990), cert. denied, 498 U.S. 1035 (1991) ("Neither cause without prejudice nor prejudice without cause gets a defaulted claim into Federal Court.").

The bulk of Petitioner's arguments for relief in Ground Nine are procedurally defaulted because they were not preserved for review. As noted above, Petitioner raises new arguments and additional jurors for comparative analysis in his habeas petition. Indeed, even the Batson rulings made by the trial court were not challenged until Petitioner's application for Post-Conviction Relief. (See App. 5216). Nonetheless, the Court will also consider Petitioner's challenges – old and new alike – on the merits, as outlined below.

**b. Batson Challenge**

The United States Supreme Court held in Batson that a "State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal

Protection Clause." <u>Batson</u>, 476 U.S. at 89. Courts are to follow a three-step process in analyzing an asserted <u>Batson</u> violation.

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

<u>Snyder v. Louisiana</u>, 552 U.S. 472, 476-77 (2008). "[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 324 (2003). "[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." <u>Id.</u> at 339. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at <u>Batson</u>'s third step." <u>United States v. Barnette</u>, 644 F.3d 192, 216 (4th Cir. 2011) (citing <u>Miller-El</u>, 537 U.S. at 241). Due to the trial court's superior position to determine credibility, "a state court's finding of the absence of discriminatory intent is 'a pure issue of fact' accorded significant deference." <u>Miller-El</u>, 537 U.S. at 339 (quoting <u>Hernandez v. New York</u>, 500 U.S. 352, 364 (1991)). Moreover, reflecting the need for deference, under § 2254 review, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." <u>Id.</u> at 340.

**Edith Owens**

The first African-American juror struck by the prosecution at jury selection was Edith Owens. The Prosecutor offered three facially race-neutral reasons for this strike: (1) that on observing Owens during *voir dire*, he had the impression that she was afraid of Petitioner; (2) that she was weak on the death penalty; and (3) that she knew nothing about the case. (App. 1340). The trial court found this explanation facially neutral. (Id.). In response, the Petitioner offered one juror for comparison whom he believed was intimidated by the prosecution. (Id. at 1341). However, the court denied the Batson challenge, finding the proffered juror not similarly situated. (Id. at 1340-41). Petitioner offers several additional arguments in his petition – including new juror comparisons – each of which are addressed below. However, he does not reassert for this Court's consideration the comparative analysis he made at the original Batson hearing. Based on his new arguments, Petitioner asks the Court to find the Government's reasons for striking Owens not credible.

First, as to the Prosecutor's impression that Owens was afraid of Petitioner (which Petitioner characterizes as a "demeanor-based explanation"), Petitioner argues that the record offers nothing to support this basis. (ECF No. 31, p. 50). Absent some support from the record, Petitioner argues, the Court cannot credit the Prosecutor's demeanor-based explanation unless the trial court made a finding on the matter. (Id.). However, there is support in the record for the Prosecutor's demeanor-based explanation. Also, this Court finds that Petitioner's legal basis for his challenge is not fully applicable to this case, as addressed below.

Petitioner relies heavily on Snyder v. Louisiana, 552 U.S. 472 (2008), for the proposition that a court cannot rely on a prosecutor's demeanor-based explanation absent either (1) support from the record or (2) a credibility finding by the trial judge on the demeanor explanation.

However, the Court notes that Petitioner's reliance on <u>Snyder</u> is misplaced. As an initial matter, the Supreme Court recently addressed the necessity of a credibility finding by the trial judge on a prosecutor's demeanor-based explanation in <u>Thaler v. Haynes</u>, 559 U.S. 43 (2010). In <u>Thaler</u>, the Supreme Court stated "neither [<u>Batson</u> nor <u>Snyder</u>] held that a demeanor-based explanation for a peremptory challenge must be rejected unless the judge personally observed and recalls the relevant aspect of the prospective juror's demeanor." <u>United States v. Barnette</u>, 644 F.3d 192, 214-15 (4th Cir. 2011) (quoting <u>Thaler</u>, 559 U.S. at 47). Thus, even had Judge Pieper failed to indicate his observance and recollection of Owens' demeanor, this fact would not be totally dispositive in this case. Furthermore, Judge Pieper did in fact comment on Owens' demeanor near the beginning of jury selection, as further discussed below.

Even absent <u>Thaler</u>'s holding, the Court finds that <u>Snyder</u> is clearly distinguishable from the present case. First, contrary to Petitioner's arguments, the record does offer support for the Prosecutor's explanation that he believed Owens was afraid of Petitioner. For example, near the beginning of Owens' *voir dire*, Judge Pieper told Owens to "[j]ust relax." (App. 259). This indicates that Owens exhibited nervousness and tension. Second, at the <u>Batson</u> hearing, Petitioner did not challenge the Prosecutor's characterization of Owens as fearful; rather, he offered for comparison another juror he believed had also exhibited fear. (App. 1342). While not dispositive, these examples from the record provide sufficient support for this Court to find credible the Prosecutor's race-neutral explanation.

Moreover, even if not distinguishable, <u>Snyder</u> is a 2008 case and thus "could not have constituted clearly established Federal law as determined by [the Supreme Court] for purposes of [Petitioner's] habeas petition because [the Supreme Court] decided <u>Snyder</u>" more than four years after the state trial court's decision on this issue. <u>Thaler</u>, 559 U.S. at 49 (internal citation

omitted). Thus, the state court could reasonably have upheld the Prosecutor's strike based on the state of the law pre-<u>Snyder</u>. As such, this Court cannot find that the state court's decision was contrary to or an unreasonable application of clearly established federal law as decided by the Supreme Court.

Petitioner also argues that comparative analysis undermines the Prosecutor's "fear" explanation.[16] (ECF No. 31, p. 50). Petitioner argues that a white juror – Joy Smith –  stated at *voir dire* that her "heart was about to jump out of [her] skin"; yet, she was not struck from the jury. (<u>Id.</u>). While the Court acknowledges that Smith's statement – like the trial court's statement to Owens to "relax" – could indicate fear of Petitioner, such a determination is impossible from the cold record alone. Smith's statement may have indicated that she was nervous to be in Court, nervous to be around Petitioner, or something else entirely. Given the variety of possible explanations, the Court concludes that Petitioner has not shown by clear and convincing evidence that the Government's decision to strike Owens, but not Smith, was racially motivated. Also, Judge Pieper did not direct Smith to relax, which suggests that any tension felt by Smith was significantly less than that felt by Owens.

Petitioner next addresses the Prosecutor's second basis for striking Owens from the jury – that she was weak on the death penalty. (ECF No. 31, p. 50). Petitioner argues that Owens' responses at *voir dire* did not indicate any such weakness; rather, Owens indicated she could give

---

[16] A prosecutor may base his strike on one factor or on a combination of factors. <u>See</u> <u>United States v. Grandison</u>, 885 F.2d 143, 145 (4th Cir. 1989) (affirming trial court's ruling on <u>Batson</u> challenge where trial court "concluded that the combination of facts and circumstances reveal[ed] an inference opposite to that of racial discrimination") (internal citation omitted); <u>United States v. Stephens</u>, 514 F.3d 703, 711 (7th Cir. 2008) ("[P]icking jurors is a complex and multifaceted process. Individual factors or characteristics often do not provide the 'silver bullet' that will mean acceptance or rejection of any potential juror… it is a combination of factors that will determine whether a party believes a juror will be favorable to their side.") (internal citation omitted). Thus, it is relevant to this case that the Prosecutor below offered a variety reasons for striking Owens and it is directly relevant to the comparative juror analysis. Specifically, it is important to note that while Petitioner offers several jurors for comparison, he does not offer a single juror who shares the combination of characteristics upon which the Prosecutor based his strike of Owens.

the death penalty if appropriate. (App. 279-80). The Court agrees that as transcribed, Owens'
responses confirmed that she was willing to impose the death penalty if she believed the facts
supported it. Furthermore, as Petitioner notes, the Prosecutor did not strike several white jurors
who provided similar responses to Owens on this issue. (See ECF No. 31, p. 50). The Court has
considered these factors in weighing the credibility of the Prosecutor's race-neutral explanation;
nonetheless, for the reasons described previously and below, the Court finds that Petitioner's
evidence has not established by clear and convincing evidence that the strike was racially
motivated.

    As an initial matter, the record does not reveal whether some factor, not apparent from
the face of the cold transcript alone, convinced the Prosecutor that Owens was weak on the death
penalty. It is also important that the trial court accepted the Prosecutor's explanations as race-
neutral and that Petitioner did not challenge this basis for striking Owens. Had the Petitioner
challenged this basis for striking Owens at trial, there may have been other valid reasons the
Prosecutor could have asserted for exercising the strike. Thus, the Court finds this explanation
credible, especially when viewed in light of (1) the significant deference accorded to the state
court's finding of the absence of discriminatory intent; (2) Petitioner's failure to challenge the
explanation at trial; and (3) the two additional explanations for the strike (the first of which,
related to fear, this Court finds sufficient on its own as discussed above). Thus, the Court
continues to find that Petitioner has simply not shown by clear and convincing evidence that the
strike was racially motivated. It would be speculation to find the strike racially motived on these
facts.

    Finally, the Court addresses the Prosecutor's third basis for striking Owens – that Owens
knew nothing about the case. As Petitioner notes, at least two white jurors also indicated that

they knew nothing about the case, and yet they were not struck. (See App. 564, 987). However, Petitioner did not bring these jurors to the trial judge's attention, and as a result, this matter was not explored further at the Batson hearing. The Prosecutor was not given the opportunity to address this basis for a Batson challenge because these two jurors were neither challenged nor raised for comparison in connection with Owens. Furthermore, while those two jurors may have arguably been similarly situated as far as their knowledge about the case, they were not similarly situated as to the combination of explanations the Prosecutor gave for striking Owens. In particular, there is no evidence that they were afraid of Petitioner, and Petitioner has not argued otherwise. Again, this explanation, in combination with the additional explanations from the Prosecutor, is sufficient to uphold the strike as race-neutral. By having failed to raise these jurors for comparison at trial, the Petitioner again asks the Court to speculate as to the Prosecution's reasons for striking Owens. The Court finds that Petitioner has not shown that the strike was racially motivated. The clear and convincing standard has not been met.

In summary, the Court finds that Petitioner has not shown by clear and convincing evidence that the Prosecutor's proffered race-neutral reasons for striking Owens from the jury were not credible. As a result, Petitioner has not established purposeful discriminatory intent, and he is not entitled to relief on this ground.

### Matthew Young

Next, the Prosecutor offered three reasons for striking Matthew Young: (1) that Young stated in his *voir dire* that he knew a defense witness named Jabari; (2) that he stated that he heard about the incident on the street; and (3) that he was weak on the death penalty. (App. 1342). The trial court found that the Prosecutor's explanation was facially race-neutral, and in response Petitioner offered a juror for comparative analysis. (Id. at 1342). However, the trial

court found that the comparative juror was not similarly situated because the comparative juror knew a witness for the prosecution rather than for the defense. (Id. at 1347-48). In his petition, Petitioner raises Batson claims regarding this juror that were not raised at trial. In particular, Petitioner now argues that the Prosecutor was mistaken regarding Young's familiarity with a defense witness. (ECF No. 76, p. 39). In addition, the Petitioner offers additional jurors for comparative analysis. (Id. at 40-41).

Petitioner challenges the Prosecutor's first basis for striking Young because it appears from the record that Young was mistaken about whether Jabari was a defense witness. However, while the record indicates that Jabari may have been a witness on the prosecution's list rather than on the defense's list, the record also indicates that this mistake did not come to light until the Batson hearing. As a result, there is nothing in the record that indicates the challenge was pretext for a discriminatory strike. Furthermore, as Judge Pieper noted at the hearing, even a mistaken belief by the Government can be a facially neutral reason. (See App. 1345, 1348). There is no indication that the Prosecutor's basis for the strike was asserted in bad faith. Thus, Petitioner has failed to show clear and convincing evidence that the Prosecutor struck Young based on his race.

Petitioner's challenge to the Prosecutor's second explanation also fails. Petitioner characterizes the Prosecutor's statement that Young had heard of the incident on the street as a "gross mischaracterization." (See ECF No. 76, p. 39). Yet as Petitioner himself notes, Young stated at *voir dire* that he had heard – not from the newspaper but from *personal input* – that the case involved "a struggle situation, like a bust or something." (Id. at 40). Furthermore, Petitioner mischaracterizes the Prosecutor's explanation as based on Young's knowing "too much about the case," (id. at 33), when in fact it appears that the Prosecutor's challenge was based on the source

of Young's information (see app. 1342 ("[H]e heard about this incident on the street.")). The Prosecutor never indicated that he believed Young knew "too much." Again, this is simply not a basis to find purposeful discrimination.

In addition, while Petitioner offers another white juror – Michelle Wilson – as a similarly situated juror who knew even more about the case than Young, these jurors differ based on the sources and extent of their knowledge and thus are not similarly situated. Young, for example, said he heard about the case from personal input and that he'd heard the case involved "[a] struggle situation, like a bust or something." (ECF No. #76, p. 40). Wilson, on the other hand, had heard television and newspaper coverage indicating two police officers were killed and that they had families and children. (App. 543). Young's knowledge – which was based on personal input that apparently mischaracterized the situation as a "bust" rather than a police response to a CDV incident – is markedly different than Wilson's knowledge – which came from news coverage and which appeared to accurately represent the facts of the case. It is not a reflection of purposeful discrimination to strike a juror whose preconceived view is that the case involved a "bust or something," not intentional homicide.

Finally, Petitioner's challenge to the Prosecutor's third explanation – that Young was weak on the death penalty – fails as well. Petitioner argues that a white juror, Murray, was similarly situated to Young in that she "stated that she was a category three individual and that she would have to listen to all the evidence before imposing the death penalty." (ECF No. 76, p. 41). However, Murray's responses were markedly different than those of Young, who initially indicated that returning a sentence of death "would probably not be within me," and that "[i]t would be hard for me." (App. 445). Young did not indicate that he could sign a recommendation of death until the Prosecutor began questioning him. These reasons to strike are not based on

42

race. As a result, the Court finds that Murray was not a similarly situated juror. Petitioner has failed to establish by clear and convincing evidence that the Prosecutor's strike was discriminatory.

## Antwoine Crosson

Next, regarding Antwoine Crosson, the Prosecutor offered several reasons for his strike: (1) that Crosson is from the town where he lived; (2) that his wife taught Crosson's brother; and (3) that he knew Crosson's brother and had prosecuted him for criminal sexual conduct. The trial court found that the Prosecutor's explanation was facially race-neutral. Indeed, these reasons strongly indicate that the Prosecutor's basis for striking Crosson were race-neutral. Petitioner did not offer comparative jurors at trial, but he now challenges the Prosecutor's strike of Crosson on the grounds that two similarly situated white jurors were not struck.[17] However, even Petitioner notes that neither of the white jurors had a relative who "was prosecuted by the solicitors involved in the [Petitioner's] trial…" (ECF No.76, p. 42). Again, the fact that Crosson had a relative prosecuted by the solicitors involved in the Petitioner's trial is a strong, race-neutral basis for exercising a strike.

This Court finds, as the trial court found, that the Prosecutor offered three facially race-neutral reasons for striking Crosson. Furthermore, the jurors now offered for comparative analysis are clearly not similarly situated. While both jurors offered for comparison had relatives who had been prosecuted for DUIs, neither relative had been prosecuted by the solicitors involved in Petitioner's trial. As well, there is no indication that the jurors who were not struck knew the solicitors or the solicitors' families. As a result, the Court finds that neither juror was

---

[17] The Court notes that Petitioner also challenges the Prosecution's statement that Crosson "just isn't a good juror." (ECF No.76, p. 41). However, this statement was plainly not offered by the Prosecutor as sufficient justification in and of itself.

similarly situated and that Petitioner has failed to establish by clear and convincing evidence that the Prosecutor's strike was discriminatory.

**Kerry Brown**

Finally, the Prosecutor indicated that he struck a fourth juror, Kerry Brown, because she "has a pending criminal domestic violence [sic], and this entire case started from a criminal domestic violence [sic]…." (App. 1351). The Prosecutor also noted, as another reason for striking Brown, that she had indicated that she had not heard about Petitioner's case. (Id. at 1351-52). In response, the trial court found that both explanations were facially neutral reasons, and Petitioner offered no jurors for comparative analysis.

With regards to the criminal domestic violence matter, Petitioner challenges the Prosecutor's strike of Brown because "it is difficult – if not impossible – to imagine how being a victim of domestic violence would render Ms. Brown a poor juror in the case at bar. …If anything, [her] status as a victim would have made her more likely to favor the prosecution." (ECF No. 76, pp. 42-43). As an initial matter, while the record reflects that Brown had a pending criminal domestic violence matter, it is not clear whether she faced a criminal domestic violence charge or whether she was a victim. (See App. 1351). Either way, however, the charge is relevant because this case stemmed from a domestic violence incident. Whether the juror was a victim or a defendant is not controlling. The Prosecutor's reason for the strike is race-neutral. The Court finds that the state court did not act unreasonably in upholding the Prosecutor's strike of Brown on this basis.

With regard to the Prosecutor's second basis for striking Brown – that she did not know anything about the case – Petitioner offers two white jurors for comparative analysis. Like Brown, these jurors indicated that they did not know anything about the case. However, unlike

Brown, they were not involved in a pending criminal domestic violence matter. As a result, they are not similarly situated, and as noted above, the prosecution is entitled to consider race-neutral factors in combination when deciding to exercise its strikes. Because the Prosecutor offered a race-neutral explanation, the Court finds that Petitioner has failed to establish by clear and convincing evidence that the Prosecutor's strike was discriminatory.

In summary, the Court has reviewed each of the specific issues raised in Ground Nine. The Court has also carefully reviewed the Reports and Objections, the record – which reflects what the Petitioner raised at the time of trial and what he now raises related to jury selection – and the relevant authority – including Fourth Circuit and Supreme Court case law. Having completed this review, the Court finds that the Magistrate Judge's recommendations regarding Ground Nine should be accepted and that Petitioner is not entitled to habeas relief.

## H.  Ground Ten

In Ground Ten, Petitioner argues that he was deprived of his Sixth and Fourteenth Amendment rights to a fair trial because the jury was subject to several improper, extraneous influences. Specifically, Petitioner alleges that (1) there was an "injection of religion into the juror's [sic] deliberative process"; (2) following an issue involving a bomb-sniffing dog, some of the jurors were led to believe that the jury had been sequestered as a result of threats made by Petitioner's "followers"; and (3) a juror engaged in impermissible, prejudicial contact by asking a minister for guidance regarding the death penalty. (ECF No. 31, p. 54). The Court notes that these issues were not raised to the trial court, on direct appeal, or through a post-conviction motion or habeas petition in a state trial court; they were first raised through a petition for a writ of habeas corpus filed within the original jurisdiction of the South Carolina Supreme Court. (Id. at 56). The South Carolina Supreme Court denied relief. In its discussion of these issues, the

Magistrate Judge's Report finds that the state court could reasonably have concluded that, with the exception of the one juror who approached her minister, the jurors' reliance on religion did not amount to a prejudicial extraneous influence. In addition, the Magistrate Judge finds that the information regarding the bomb-sniffing dog did not warrant a hearing because it did not concern a matter before the jury. In response, Petitioner specifically objects to these findings except as to the juror's contact with a minister, which is further discussed below.

Regarding the juror's contact with a minister, the Report recommends that, should the Court not find the claim procedurally defaulted, it should permit limited evidentiary development. Pursuant to this recommendation, the District Court permitted the Defendant to first file an affidavit from the juror on the issue. (ECF Nos. 81, 87). Upon the filing of the juror's affidavit, the Magistrate Judge then conducted an evidentiary hearing on the issue. (ECF No. 95). Briefing followed and the Magistrate Judge entered a Supplemental Report and Recommendation ("Supplemental Report"). (ECF Nos. 106, 107, 110). In the Supplemental Report, the Magistrate Judge finds that while the juror's contact with a minister constituted an impermissible external influence, the contact did not prejudice Petitioner and did not have "a substantial and injurious effect on the verdict." (ECF No. 110, p. 5). Accordingly, the Supplemental Report recommends that the Court grant Respondent's motion for summary judgment as to this claim. (Id. at 6). Petitioner filed objections to the Supplemental Report on March 20, 2014. (ECF No. 112). The Court will now discuss each of the three issues raised in Ground Ten.

### a.  Injection of Religion

The first issue raised by Petitioner in Ground Ten is that there was an "injection of religion into the juror' [sic] deliberative process." (ECF No. 31, p. 54). Specifically, Petitioner

asserts that jurors held hands and prayed during deliberations, brought Bibles and copies of scripture to the jury room, and relied on specific Bible passages to aid in their decision. However, as the Report finds, the state court could reasonably have concluded that the jurors' reliance on the Bible and prayer did not amount to a prejudicial extraneous influence triggering the need for a hearing or meriting habeas relief. The Fourth Circuit has found that "the Bible is not an 'external' influence." Robinson v. Polk, 438 F.3d 350, 364 (4th Cir. 2006). Rather, "the reading of Bible passages invites the listener to examine his or her own conscience from within." Id. at 363. Regarding the prayer, Petitioner fails to indicate how the jurors, without any indication of third party involvement, were extrinsically influenced by praying during deliberations. Furthermore, prayers offered by jurors with no external involvement would seem – perhaps even more so than the Bible – to invite inner examination of oneself. See Robinson, 438 F.3d. 363.

Furthermore, in regards to Bible review and prayer, Petitioner's reliance on Barnes v. Joyner, 751 F.3d 229 (4th Cir. 2014), and Hurst v. Joyner, 757 F.3d 389 (4th Cir. 2014), is misplaced. The District Court has carefully reviewed these decisions. Barnes and Hurst involved more than a juror reading from the Bible; in both cases, a third party met with a juror and directed or was asked to direct the juror to certain passages in the Bible. See Barnes, 751 F.3d at 251; Hurst, 757 F.3d at 398. Petitioner has provided no evidence that any jurors in this case contacted a third party with regard to prayer or Bible review.

In sum, the Court concludes that the state court could reasonably have concluded that Petitioner's Sixth and Fourteenth Amendment rights were not violated by the jurors' involvement of prayer and scripture review during deliberations. As a result, the Court finds that the Magistrate Judge's recommendations as to this issue should be accepted.

### b. Threats

The second issue involves allegations that some jurors were led to believe that, "[d]uring trial, there had been threats from Petitioner's 'associates,' and that [manure found in the jury box] came from a bomb sniffing dog that was being used daily to inspect the courtroom for bombs." (ECF No. 31, p. 54). One juror reported similar information in her affidavit. (ECF No. 87). A law student's affidavit, in recounting juror interviews, reported "[s]ome of the jurors stated that this was frightening and that they were, and continue to be, quite scared of [Petitioner], his 'followers,' friends, and family." (ECF No. 32-1, p. 2). The law students' affidavit was not specific, and there are no affidavits from individual jurors confirming the law students' statement regarding jurors' fear.

The Sixth and Fourteenth Amendments of the United States Constitution guarantee a defendant a fair trial by a panel of impartial and indifferent jurors. Estelle v. Williams, 425 U.S. 501 (1976). "An impartial jury is one that arrives at its verdict 'based upon the evidence developed at trial' and without external influence." Barnes, 751 F.3d at 240 (quoting Irvin v. Dowd, 366 U.S. 717, 722 (1961)). As a result of these constitutional concerns, a rebuttable presumption of prejudice applies to communications or contact between a third party and a juror concerning the matter pending before the jury. Id. at 241 (citing Remmer v. United States, 347 U.S. 227, 228 (1954)). "Given a jury's role during the sentencing phase of a capital case, 'the matter pending before the jury' is to determine whether or not the defendant ought to receive the death penalty." Id. at 249 (citing Caldwell v. Mississippi, 472 U.S. at 320, 329 (1985)). The Eight Amendment "requires consideration of aspects of the character of the individual offender… as a constitutionally indispensable part of the process of imposing the ultimate punishment of death." Woodson v. N. Carolina, 428 U.S. 280, 281 (1976). However, "not every

allegation of an unauthorized communication between a juror and a third party will trigger the Remmer presumption and its corresponding hearing requirement." Barnes, 751 F.3d at 244. Rather, "the Remmer presumption and hearing requirement are triggered after the party attacking the verdict satisfies the 'minimal standard' of showing that 'extrajudicial communications or contacts [between a juror and a third party] were more than innocuous interventions.'" Id. at 245 (quoting United States v. Cheek, 94 F.3d 136, 141 (4th Cir. 1996)).

As the Magistrate Judge indicated in the Report, the information jurors reportedly received from a third party related to Petitioner's "associates" was innocuous, not prejudicial, and did not concern a matter before the jury. Thus, the Court finds that the Remmer presumption does not apply and that a hearing on this issue is not required. Here, the matter before the jury was to determine whether Petitioner should have received the death penalty. See Remmer, 347 U.S. at 249. To make this determination, the jurors were required to consider *Petitioner's* character. Because the information allegedly provided to certain jurors at best implicated the character of individuals not before the court, the Magistrate Judge correctly concludes that the information did not concern a matter before the jury. This issue does not rise to the level of contact discussed in Barnes, Hurst, or Remmer. The record reflects that this contact had no influence on jury deliberations. As a result, the Court finds that the Magistrate Judge's recommendations as to this issue should be accepted and that no relief is warranted.

### c.   Juror Contact with Minister

The third issue in Ground Ten relates to a juror who allegedly engaged in impermissible, prejudicial contact by asking a minister for guidance regarding the death penalty. Before being seated, a juror did make contact with an Episcopalian priest – Father Law – whom she described as a friend; however, she was not a member of his church. (See ECF No. 101, pp. 8-9). In his

Supplemental Report addressing this issue, the Magistrate Judge found that because the juror's "contact with Father Law did not have a substantial and injurious effect or influence in determining the jury's verdict, Petitioner is not entitled to habeas relief" on this ground. (ECF No. 110, p. 6). In response, Petitioner objects that "[t]he totality of the circumstances, including the content of [the juror's] conversation, the circumstances surrounding the conversation, and the instructions of the trial court, demonstrate that [the juror's] communication with [the minister] likely affected her decisions as a juror." (ECF No. 112, p. 8).

The District Court reviewed numerous cases in its evaluation, including prominent Fourth Circuit cases that address this issue. As discussed above, two recent cases – <u>Barnes</u> and <u>Hurst</u> – address the issue of juror contact with a third party. In both cases, a juror contacted a third party for advice: in <u>Barnes</u>, a juror contacted a minister to ask a question about the death penalty, and in <u>Hurst</u>, a juror sought advice from her father about "where she could look in the Bible" for guidance on deciding whether to impose the death penalty. <u>See</u> <u>Barnes</u>, 751 F.3d at 236, <u>Hurst</u>, 757 F.3d at 392. <u>Barnes</u> held that "when the defendant presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury," a presumption of prejudice "*must* be applied, and … a hearing *must* be held." <u>Hurst</u>, 757 F.3d at 397 (citing <u>Barnes</u>, 751 F.3d at 242, 246). The Fourth Circuit thus found, in cases with facts similar to those before this Court, that a hearing was appropriate and, indeed, required. The Court notes, however, that a hearing does not result in automatic relief; rather, the hearing simply allows the Court the opportunity to determine whether the third party contact was harmless. <u>See</u> <u>id.</u> at 399. If the hearing reveals that any communication to the juror was harmless and did not have a substantial and injurious effect or influence in determining the jury's verdict, there is no basis for federal habeas relief. <u>See</u> <u>id</u>. at 398-99. In light of these cases, the District Court referred the

present case to the Magistrate Judge to conduct a hearing. The member of the jury who made contact with Father Law testified at the hearing.

The affidavits and testimony in this case reveal that the juror contacted Father Law because she "knew it would be difficult for [her] to make the sentencing decision in a death penalty case and wanted to know what [her] faith would say about voting in favor of the death penalty." (ECF No. 87). At the evidentiary hearing, the juror explained that she contacted Father Law after she had filled out the juror questionnaire and participated in individual *voir dire*, but before she was selected as a juror on Petitioner's case. (ECF No. 101, pp. 16-17). As indicated above, Father Law was Episcopalian Priest, but the juror was not a member of Father Law's church. (Id. at 17). Rather, the juror knew Father Law because she cleaned his house and because he was occasionally a guest at the restaurant where she worked as a server. (Id. at 9). The juror stated that religion plays a very important role in her life and that while Father Law did not give her formal religious counsel, they did have religious conversations. (Id. at 9-10). On the occasion in question, she contacted Father Law to pray with her for strength; she was also concerned that God might not forgive her if she had to vote for the death penalty. (Id.). Father Law indicated that she should follow the law and that God would forgive her; they did not discuss the case at all. (Id. at 18, 20). Furthermore, she did not know the facts of the case at the time of her conversation, only that it was a big case and that she was going to be sequestered. (Id.). She did not recall for sure whether, at the time of the conversation, she knew she was being considered as a juror for a death penalty case. (Id. at 21-22). As already noted, the contact occurred before the juror was seated, not during the sentencing phase.

Having reviewed the record, including the transcript of the hearing, subsequent briefing, the Supplemental Report, and the objections, the Court agrees with the Magistrate Judge that the

juror's contact constitutes an impermissible external influence; however, as the Magistrate Judge notes, the contact did not have substantial and injurious influence on the jury's verdict. The minister stated that the juror should "follow the law"; these instructions are no different from those the juror would have received from the trial court. The juror did not indicate that the minister influenced her decisions or directed her to any religious text, nor did she indicate that she shared her discussion with other jurors. Finally, the juror stated that she and the minister did not discuss the actual case, including details of how the juror or jury should vote or reach a decision regarding innocence or guilt or regarding whether to impose a life or death sentence. Thus, the Court concludes that the juror's contact did not prejudice Petitioner in this case.

Petitioner asserts that without the minister's advice, the juror might not have been willing or qualified to serve as a juror, resulting in a different juror taking her place. He further asserts that had she served without the minister contact, she might have been more hesitant to vote for the death penalty. These arguments have no merit. As noted above, the juror had already completed *voir dire* and had been qualified as a juror *before* she contacted the minister. She had already indicated that she was able to impose the death penalty if the facts supported this decision. (App. 578-79). The juror did not indicate that her contact influenced her service as a juror. Thus, the Court finds that the contact did not have a "substantial and injurious effect or influence in determining the jury's verdict," which is required before relief is warranted.

In summary, the Court has reviewed the relevant legal authority and the factual record – including the petition, hearing transcript, Supplemental Report, and objections. Having completed this review, the Court again notes that Petitioner failed to raise this matter until he filed his state habeas petition; as a result, the issue is procedurally barred. Nonetheless, the Court concludes that the claim also fails on the merits. As noted, the juror's contact with Father Law had no

impact in connection with her role as a juror. Further, there is no evidence that the contact had "a substantial and injurious effect or influence" in determining the jury's verdict. In conclusion, the Magistrate Judge's recommendations regarding Ground Ten should be accepted and Petitioner is not entitled to habeas relief.

## <u>Conclusion</u>

In light of the standard set forth in <u>Wallace</u>, the Court has reviewed, <u>de novo</u>, the Report, the Supplemental Report, and the objections. After careful review of the Reports and objections thereto, the Court hereby **ACCEPTS** the Report and the Supplemental Report. (ECF Nos. 75, 110). Petitioner's objections (ECF Nos. 76, 112) are **OVERRULED**. Respondents' motion for summary judgment (ECF No. 45) is **GRANTED** and Petitioner's § 2254 Petition (ECF No. 31) is **DISMISSED**. In addition, as addressed *supra* pp. 8-10, the Petitioner's motion to stay (ECF No. 77) is **DENIED**.

The Court has reviewed Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in accordance with Rule 11 of the Rules Governing Section 2255 Proceedings. The Court concludes that it is not appropriate to issue a certificate of appealability as to the issues raised in this petition. However, realizing that this is a death penalty case, the Court advises Petitioner that he may seek a certificate from the Fourth Circuit Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED**.

s/Terry L. Wooten
Chief United States District Judge

May 18, 2015
Columbia, South Carolina